THE PEOPLE v. ELIZABETH VANDERHOOF.

*Criminal law—Murder—Arsenical poisoning—Evidence—Expert testimony—Hypothetical questions—Duty of prosecutor—Medical books.*

1. Respondent was convicted of the murder of her husband by arsenical poisoning, and sentenced to State prison for life, which judgment was reversed, and a new trial ordered.
2. The following propositions are summarized from the opinion of Mr. Justice MORSE, which was concurred in by SHERWOOD, C. J.:

*a*—It has been declared by the courts that expert testimony is not of the best or highest order, and that it is extremely dangerous, unless well guarded, and closely confined within its legitimate province.

*b*—An expert witness is to be judged from the same standpoint as any other, and if the jury find his conclusions or opinions to be the result of a biased or interested judgment, or of self-serving or improper motives, or that such opinions or conclusions are worthless or unreasonable in the light of the facts

in the case, they have a right to reject such opinions, partially or entirely, in making up their verdict.

c—Facts are always superior to theories, and the opinions of medical men are no more infallible than those of other men. Nor is their reason or judgment any less liable to be warped or colored by bias and interest than that of others; nor are they deficient in that pride of opinion which sometimes leads men "convinced against their will to be of the same opinion still."

d—It was the duty of the prosecution to lay the whole *case* of the decedent's sickness and death, as they had made it, before the expert witnesses, or as much of it as had an important bearing upon his death, instead of selecting detached portions of it to suit their theories of the case.

e—Expert testimony is only allowed upon the theory that it is necessary in some cases, where the jury cannot be supposed to comprehend the significance of facts shown by other testimony, which needs scientific or peculiar explanation by those who do comprehend it. *People v. Millard*, 53 Mich. 75.

f—It has time and time again been said by this Court that the duty of the prosecuting attorney is not to distort or withhold evidence in order to convict. He is the representative of the people, of which the accused is one, and his duty is to fairly and fully lay before the jury every material fact and circumstance known to him to exist, without regard to their tendency to establish the guilt or innocence of the respondent. This is his whole duty,—no more, no less.

g—The contents of medical books cannot be got before the jury, unless, as in the case of *Pinney v. Cahill*, 48 Mich. 584, the expert is unwise enough to state that a certain book lays down a certain proposition.

3. CHAMPLIN and LONG, JJ., concurred in the result, and CAMPBELL, J., did not sit.

Error to Berrien. (Smith, J.) Argued April 25 and 26, 1888. Decided July 11, 1888.

Respondent was convicted of murder, and sentenced to State prison for life. Judgment reversed, and new trial ordered, and bail fixed at $3,000. The facts are stated in the opinion.

*Clapp & Bridgman,* for respondent.

[Brief is confined to a discussion of the evidence and charge. No authorities cited.—REPORTER.]

*Moses Taggart,* Attorney General, for the people.

MORSE, J. The defendant was accused and convicted in the Berrien circuit court of the murder of her husband, William Vanderhoof, by administering to him arsenic on or about December 1, 1883.

The evidence showed conclusively that William Vanderhoof, from the winter of 1882 and 1883, and especially in the spring and summer of 1883, was not a healthy man. He was ill, and had spells of distress and burning in his stomach, and pain about the heart, with trembling of the body. His nerves were affected, and he was troubled at times with a coldness and numbness of his lower extremities. He also had dizzy spells, and thought his heart was affected; would have a feeling of suffocation, and could not lie upon his left side.

The physician who attended him in his last illness treated him for erysipelas in September, 1883, at which time he complained of a pain about his heart. He had made occasional complaints of heart trouble to this same physician for three years before his death. This physician, Dr. Levi Mann, treated him from October 5, 1883, almost regularly until the time of his death. On October 5 he complained of numbness in his arms and body, and nervousness. On the 13th of the same month had pain in the lungs. During the time from this date up to the last of November, with some intermissions of slight fever, his principal trouble and complaint was nervous spells, numbness, "dizzy and falling spells," pain about the heart, and difficulty in breathing. Dr. Mann saw no symptoms indicating arsenical poisoning up to November 29. On that day, about 9 o'clock in the morning, he found his patient's pulse raised to 140, and, by pressing

his finger upon the radial artery, ne discovered, as he thought, a failure of the heart's action.

"The pulse was very irregular, very quick and weak, and almost imperceptible at the wrist, and a little fear of regurgitation."

The week before he died, Vanderhoof had some diarrhea, —four or five passages a day. On the morning of the 29th, the tongue was of a slimy appearance. There was no complaint of burning in the stomach or bowels, and no pain in the stomach or bowels. The bowels moved without pain. On the 30th, the patient, in the language of the physician,—

"Was in a pulseless condition. His tongue had a slimy appearance, and had been so for nearly a week. There was no complaint of burning in the stomach. He never complained of burning anywhere about his body."

There was no complaint about his bowels that indicated arsenic, and they were not bloated. On the 29th, the doctor says he was unable to assign any other cause for the condition of Vanderhoof than failure of heart action. There was no altered expression of his countenance on that day, but on the 30th there was a change; "he had a white marble appearance, and a cold, clammy surface." The raising of the pulse from 80 up to 140 was the symptom which, in Dr. Mann's opinion, might have indicated arsenical poisoning, and the only one he observed, and he testifies that he could not tell whether this was the result of arsenic or of a weak heart. The slimy tongue was not a symptom of arsenical poisoning, but of indigestion.

Vanderhoof called on Dr. Henderson, who examined him in August, 1883. He said to Henderson, at that time, that he had taken medicine which did him no good, but made him worse. He said:

"I want you to give me something to do me some good. If you can't, I don't want you to give me anything."

71 Mich. 11.

Dr. Henderson testifies:

"He was restless, crossing his feet, moving his hands; seemed to be in a nervous condition generally. His eyes were in motion. There was every indication of nervousness. I examined him carefully, and gave him some medicine. He said that oftentimes after eating a meal, and especially dinner, he would go out to work, and he would feel all right for a while; but, when his stomach would be empty, he would have a sensation of uneasiness in his stomach, and he would have trembling spells, and he would have to sit down, and there was a burning and a heat in his stomach. I examined him for organic trouble. I could not discover any. I examined his urine, but there was nothing I could see. I gave him calomel and quinine. I told him I could not tell what was the matter with him.

"I told him to come back. He said he had been sick for some time. He did not say a word about his heart. I examined his heart and his lungs. I listened over the region of the heart, and could hear it. His pulse was a little rapid from the nervousness. His heart was a little rapid ; might have been organic, slightly, from the nervous trouble; but no organic affection of the heart that I could discover. If there was any lesion, I could have detected it. I examined his lungs casually. He had an unusual look about his face. Features were somewhat sunken, and he seemed rather emaciated in the face. He seemed so ; it might have been his natural appearance.

"I don't remember that he complained of thirst. His bowels were constipated at the time he called on me. His bowels were bound up. I don't remember whether he said he had diarrhea or not. He spoke of this trembling. He said that was frequent, and numbness. After his stomach began to get empty, after eating, he would then experience a sensation of nausea, and would begin to feel bad in his stomach. His stomach would burn, and he would have to sit down, and a sweat would break out upon him."

Vanderhoof died at about 7 o'clock on the morning of December 1, 1883. Samuel Chapman, Frank Batton, Thomas Vanderhoof, father of the deceased, Tryphena Vanderhoof, wife of Thomas, and step-mother of William,

John Chapman, the respondent, and her children were in the room when he died. Batton testified that, from about midnight until the time of Vanderhoof's death, he stayed in the room all the time. While there, Vanderhoof—

"Was thrashing around, grasping the bed-quilts and one thing or another. He hallooed to open the door, and give him air; that he was smothering."

He was "flouncing around with his feet and legs" while lying upon the bed. The witness does not recollect of his complaining of anything, "only a smothering with heat."

"His hands and arms were numb. He got up several times during the after-part of the night. He claimed to have the diarrhea. His eyes were bloated; his face was swelled; his eyelids, upper and under, were bloated,—kind of a pale yellow. His face was a kind of yellow. He changed his bed a short time before he died, may be 15 or 20 minutes. He got up off from one bed, and got over onto the other. The beds were about two feet apart. Do not recollect of his asking for anything.

"Q. Did he ask for any person?

"A. Yes, sir; he kept calling for his wife during the night. They would tell him she was there. He called for his father several times during the night. I don't recollect that he said anything else. His father was present when he was asking for him. His father would say, 'William, what will you have?' and he would not say anything. He would just speak up for his father and his wife, and they would answer him, and that was the end of it. During the last 20 minutes before he died he was flouncing around with his feet, legs, arms, and hands. It was impossible to keep a blanket on him."

This witness further testified, on cross-examination, that Vanderhoof did not complain of any pain in the head. Don't remember whether he asked for water or was thirsty, and recollects no vomiting. He complained that he could not get his breath, and seemed to be suffocated; complained of his heart.

Mrs. Tryphena Vanderhoof swears that he complained of his heart and stomach during first part of the night, but didn't complain of anything that she knows of in the latter part of the night. He asked for a drink several times in the forepart of the night, and said he was thirsty. She gave him two medicine powders before Dr. Mann came, which was about midnight. He did not retch or vomit after drinking.

The body of Vanderhoof, on January 8, 1884, was removed from the grave and coffin, and an autopsy held thereon in the town hall at Galien, conducted by Drs. Bonine and Buhland. They testify that the lungs, heart, liver, and other vital organs seemed to be in a normal condition, but it is evident that they conducted the examination more with an idea of securing certain organs for chemical examination to detect poison than to observe whether or not any vital organ was affected by disease that might have caused death. They placed the following organs, or portions thereof, in hermetically sealed jars, to wit, the heart, the right lobe of the liver, the left kidney, the stomach, a portion of the spleen, and the right half of the brain. These jars were subsequently conveyed by Dr. Bonine to the University, and the contents there examined by certain professors. Drs. Palmer, Hendrix, and Bonine examined the heart and stomach and spleen. They found the spleen moderately enlarged, and the stomach gave evidence of having been somewhat congested. Dr. Palmer testifies that the heart was a rather large heart in outline, as if it was the heart of a large person.

"It was rather flabby. It did not stand up as many hearts do; and the walls of the heart, although the outlines of the heart were rather large, were not thick, but the walls of the left ventricle were thinner than is usually the case in a heart of that size. The muscular tissue was thinner. There was not as much of it as there usually is; and, being thinner, it would indicate that there was a

degree of weakness in that part of the heart. Thinning of the ventricle would make it less powerful, and the blood would not be sent as readily through the lungs as in a heart that had more muscular development; and the result of that might be, when an unusual excitement occurred or an unusual amount of exercise, that there would be some embarrassment about the circulation; some embarrassment about breathing; some difficulty in breathing; and, the blood not being thrown on readily through these veins, which come from different organs of the abdomen, they would be liable to be congested,—that is, the venous blood would be accumulated in the parts of the body from the obstruction. I think, however, there was muscular tissue enough in the heart to carry on the circulation properly, sufficiently, except under excitement or under unusual muscular exercise. I think there was some degree of weakening of the right side of the heart, but don't think that, of itself, certainly was sufficient to produce death. I have seen hearts that were even thinner than that, where patients have lived for a long time in that condition. I should say that a portion of the heart —of the muscle—seems to be healthy, what there was of it, but it was simply thin. From the examination of these organs I was entirely unable to say what was the cause of death."

He further testified that there was, at this examination, evidence of a moderate congestion of the lungs, spleen, kidneys, and liver; but what they saw was not, in his opinion, sufficient to produce any very serious consequences, and certainly not, as far as they could discover, death. There was no evidence of any congestion of the heart, but there were symptoms of inflammation about the stomach.

Prof. A. B. Prescott made the chemical examination for poison. He testifies that he found arsenic. He estimates that the stomach contained 54-100 of a grain of white arsenic; 26-100 of a grain in one pound of the liver, which usually weighs three or four pounds, so that there would probably have been in the whole liver from three-quarters to one grain of white arsenic, or its equivalent. He found a trace of arsenic in a portion of

the kidney.     He examined none other of the organs.

It will be seen, from these extracts from and summary of a portion of the evidence, that there were open to the parties two theories as to the cause of Vanderhoof's death.     The people contended that he died from the felonious administration of arsenic, and the defense took the ground that his death was caused by heart disease,— a failure of proper action on the part of that organ. The attending physician, Dr. Mann, seemed to be satisfied that the deceased died of heart trouble, and every witness who knew Vanderhoof, and observed him, or heard his complaints, gave evidence tending to show that, for nearly three years before his death, he was afflicted with different pains and symptoms, which might be reasonably laid at the door of the condition of the heart, as found by the University professors.

There was no particular motive shown upon the part of the defendant to commit the crime, and no direct evidence connecting her with it.     There was some testimony tending to show that Vanderhoof was sometimes brutal to her, and that she had made some complaints to friends as to his treatment of her.     It was shown that in the month of September she was advised by Dr. Mann to purchase " Rough on Rats " to poison rats about the house, and that the same day she purchased arsenic openly of a druggist in the place where she lived.     Some evidence was introduced for the purpose of showing undue familiarity between defendant and one John Chapman, who worked for deceased the last week of his illness.     The testimony was confined to two incidents, and the evidence as to those was conflicting, and some of it bore marks of bias as well as exaggeration upon the part of the witnesses.

One evening or night near to the time of the death of Vanderhoof, they both laid down, dressed, upon a bed in

the room where the other people were; the respondent lying cross-ways of the bed at one end, and Chapman at the other end. No one thought there was anything wrong about it at the time, as both were tired, and apparently worn out with work and watching about the house and sick bed.

The morning of the death of her husband the respondent was called to his bedside a few moments before his death. As he breathed his last, she apparently fainted away, and into the arms of Chapman, who was standing by. She said: "Oh, John; don't let me go to sleep," or "go away," some thing of that kind. She was given brandy, and so much of it that some of the witnesses thought she was under the influence of it. While she was apparently unconscious, some of the women opened the bosom of her dress, and put warm or hot cloths across her breast. These applications were continued for some time. Witnesses deposed that during this time Chapman was supporting her, and had his arm around her. One person testified that he saw Chapman's hand inside her dress. This was in plain sight of everybody who chanced to be there. No other familiarities were shown before or after this day between the parties. Chapman had been at Vanderhoof's only a week, and there is no evidence tending to show that Mrs. Vanderhoof ever saw him before he came there to work, or that she had any communication with him after the day her husband died.

It can hardly be conceived that this testimony could be relied upon to furnish any adequate motive for the murder of her husband. Yet, outside of her complaints of ill usage by her husband, no other motive was hinted at upon the trial. It is but justice to remark, also, that there was testimony tending to show that the relations between husband and wife were pleasant and harmonious.

An examination of the record discloses that this woman

was convicted upon the evidence of medical experts,—upon the opinions of men who never saw William Vanderhoof while he was alive. It is also apparent, with one or two exceptions, that these experts were biased against the respondent, and used their learning and ability, it is to be hoped unconsciously, to forward and aid the cause of the prosecution.

This case illustrates most forcibly the dangerous character of expert testimony, which has so often been called to the attention of the courts, and challenged by them. Here were professors from the University, and eminent physicians from the section of the State where the alleged crime was committed, summoned by the power of the people, and paid high prices *per diem,* for the purpose of establishing the fact that Vanderhoof must have died from the effects of arsenic administered before death. From the position they were employed to hold they could not be dislodged by the most rigid cross-examination, which laid before and fully presented to them the facts which, for a period of something over two years, by the people's own witnesses, from the lips of those who knew Vanderhoof while living, tended to show that the deceased was troubled with the same symptoms which culminated in his death, and which, as they admitted, might be attributable to heart disease. Nearly every one of them, at last, was obliged to rest his assumption of death by arsenical poisoning upon the fact that arsenic was found in the body after death.

The theory of the prosecution was that of acute arsenical poisoning; that the fatal dose was administered by the wife in his medicine, or instead of his medicine, on the night of November 30, and that, perhaps, it was also administered to him on the night of the 28th. But the experts had to admit that but few, if any, of the usual symptoms of arsenical poisoning were present, and that none were

present that could be called distinctive symptoms, except a puffiness under the eyes, which was admitted to be a feature of chronic or long-continued poisoning, and not of acute poisoning.

Dr. Scott, who was the fairest disposed of any of the experts, and who seemed to be candid, and without any particular bias in his testimony, testified that he had had some experience in arsenical poisoning, and that vomiting and purging and tenderness of the stomach (symptoms not present in Vanderhoof's case) had always been present in all cases that he had seen when a fatal dose of arsenic had been given or taken, but they are not always present in cases of chronic poisoning; and that one of the symptoms of chronic poisoning is puffiness under the eyes. This symptom was shown to be present in this case; but Dr. Scott testified that—

"Affection of the heart produces puffiness under the eyes, and it produces puffiness of the whole system."

The following hypothetical question was put to Dr. Scott, under objection:

"At and near to the time of the death of the deceased, pulse was 140, weak and quick, and almost imperceptible at the wrist; diarrhea, or repeated efforts to discharge; slimy tongue; puffiness under the eyes; difficult breathing; white marbled appearance; cold, clammy surface; cold extremities; able to get up and down, and sit up at the moment of death; after death a *post mortem* examination showed no apparent cause of death discovered; analysis of portions of the body revealed arsenic in the stomach and liver, one and one-half grains. What, in your opinion, was the cause of death?

"*A.* Died from arsenical poison."

He further testified, in explanation of his answer, that the conclusive item in the question upon which he based his opinion was the finding of the arsenic in the body; that the given symptoms, although some of them were signs of arsenical poison, were not marked enough to "give

a decided opinion to send any one to State's prison." He was also given the following symptoms by the prosecution in this question:

"*Q*. If the patient, before he died, was thrashing around, grasping the bed-quilts, and hallooing to open the door, and give him air; if he was flouncing around with his feet, hands, and legs, and complained of smothering with heat during the evening; his hands are numb; he got up several times during the after part of the night, claiming to have a diarrhea; his eyes were bloated and swelled up; his eyelids were bloated, and kind of a pale yellow; his face was kind of a yellow; he changed his bed a short time before he died, may be 15 or 20 minutes; he got from one bed onto the other; the beds were about two feet apart; he kept calling for his wife during the night, and they would tell him she was there; he called for his father several times during the last 20 minutes before he died; he was nervous, flouncing around with his feet and legs, arms and hands; it was impossible to keep a blanket on him; you should find no apparent cause of death, for death, in the organs, resulting from disease, and should find in the liver and stomach one and one-half grains of arsenic,—would you deem it necessary to make an examination of the spinal column to ascertain the cause of death?"

After answering the question in the negative, he further testified that the symptoms therein enumerated, with the exception of the puffiness under the eyes, and the great restlessness, did not indicate arsenical poison. The last hypothetical question was a very fair statement of the symptoms attending the demise of Vanderhoof as related by all the witnesses, excepting, perhaps, as to the part relating to the diarrhea. Dr. Scott also gave the usual symptoms of arsenical poison as follows:

"*Q*. I will ask you, in the beginning, of the symptoms of arsenical poison. Do you usually first find faintness and nausea, burning pain, and a sense of constriction in the throat?

"*A*. Those are the general line of symptoms as laid down. The burning is in the stomach; colicky pains

after a while in the bowels, after the burning sensation, followed by vomiting, but not in all cases unless the dose is large; very often a burning sensation in the throat; the vomited matter greenish, sometimes tinged with blood; excessive thirst; generally a cold, clammy surface of the skin; hot flashes, in many cases, flying over the body; tenderness in the pit of the stomach; cramps in the legs just before death. Prostration usually accompanies a severe case sufficient to produce death."

And Prof. Prescott, of Ann Arbor, gave the symptoms of acute and subacute arsenical poison to be—

"Burning pain in the stomach, a constriction extending over the bowels, nausea, faintness, depressed pain in the throat, purging, cramps in the legs, small depressed pulse.

"*Q.* A good deal of pain in the stomach or bowels?

"*A.* Yes, sir.

"*Q.* Colicky pain?

"*A.* Colicky pains. I am answering the question as to the probable symptoms.

"*Q.* Great thirst?

"*A.* Great thirst and headache. Drinking is followed quite often by retching and vomiting.

"*Q.* These symptoms you mention are quite intense?

"*A.* They are intense. They are variable in different cases to a great degree.

"*Q.* But with a degree of intensity always?

"*A.* Yes. There are cases where a collapse results from a dose of that kind; that is when the nervous centers are overpowered."

It will be seen that I have set forth the symptoms of this man's last illness as depicted by his family physician, and those who were present the night before he died; his general condition for a year before; the examination of his body and the vital organs after death, not particularly in a search to ascertain the cause of his death, but to procure certain organs for the chemist; and the symptoms usually and probably present in cases of acute arsenical poisoning. This I have done in order to clearly show that the case of the people absolutely depended upon the

evidence of experts if a conviction of the accused was desired, and to clearly point out the bearing of the errors assigned relative to the testimony of these experts, and the manner in which it was presented to the jury.

It has been declared by the courts that expert testimony is not of the best or highest order, and that it is extremely dangerous, unless well guarded, and closely confined within its legitimate province. It is often necessary, as in this case, in order that justice may be done; and without it the truth cannot always be determined. But it is a fact well known to every practitioner at the bar, and within the judicial knowledge of courts, I think, that latterly the experts, on both sides of a cause, become too often eager attorneys before the trial is ended and before their testimony is given. It therefore becomes desirable, and necessary to the due administration of justice, that the scope and power of their utterances shall not be extended; that they shall be held strictly to the rules laid down for their guidance and control. Especially should this be so in criminal cases, where the liberty for life of the accused is at stake.

In this case the experts were all on one side. It is claimed, and the evidence would seem to warrant the claim, that the respondent was not able to hire experts to testify in her behalf. It is probable that in cases of this kind the truth will ever be clouded with the sophistry of scientists until some way or method is devised by which expert witnesses can be procured who will be, and remain through the trial, entirely uninterested and unbiased, not only in the result of the trial, but also in the maintenance of their own peculiar notions or theories in regard to matters presented to them upon the trial. Until the time comes when experts shall be entirely fair and unbiased, with no desire upon the witness-stand except to arrive at the truth, it must be the duty of the courts

to see that no injustice be done, if that be possible.

The court committed grave error in instructing the jury as follows:

"Now, whether the deceased died of disease or not is a question for you to determine. It is a question of fact for you to determine upon the testimony as given to you. These men have testified as experts. *Now, the way to contradict the testimony of experts is by the introduction of testimony of the same class of men, that is, of experts, to show the thing to be different;* and, as a principle of law, you have no right to disregard the testimony of credible witnesses—experts—if the witnesses are credible, and substitute for them your own opinions or notions, without proof. You decide upon these questions upon the testimony given you in open court, and from the law as given you by the court."

In other words, the jury were, in substance, informed that this poor woman must meet the testimony of these experts by other experts, and, having failed to do so, the jury must take it for granted that their conclusions were correct.

An expert witness is to be judged from the same standpoint as any other; and if the jury find his conclusions or opinions to be the result of a biased or interested judgment, or of self-serving or improper motives, or that such opinions or conclusions are worthless or unreasonable in the light of the facts in the case, they have the right to reject such opinions, partially or entirely, in making up their verdict. Facts are always superior to theories, and the opinions of medical men are no more infallible than the opinions of other men. Nor is their reason or judgment any the less liable to be warped or colored by bias and interest than that of others; nor are they deficient in that pride of opinion which sometimes leads men "convinced against their will to be of the same opinion still."

Nor will the courts, in my opinion, compel, as this instruction would, a person accused and on trial for

murder to employ experts, at prices ranging from $10 to $50 per day, or else be bound by the opinions of the experts employed by the people. It might have been better, perhaps, as suggested upon the argument, if the counsel for the respondent had shown her poverty to the court, and asked that experts be summoned to testify in her behalf; but, nevertheless, she was entitled to have the testimony of the experts who were sworn, treated as would be the testimony of the other witnesses. The charge of the court virtually put the evidence of these doctors and professors upon a higher plane than the other testimony, which was manifestly wrong. It must be remembered that their testimony, which weighed against the respondent, was not the facts they detailed, but the theories and opinions they offered. This is an inferior, not a superior, kind of evidence.

The court also committed serious error, in this same direction, in alluding to the testimony of Dr. Mann, the attending physician, who knew and saw Vanderhoof, and saw his condition and symptoms, not for one day, to which the attention of the experts was confined by the people, but for the whole period of his last illness, over a month and a half, and for some time even before that. He said to the jury,—

"The defense claims that Dr. Mann's testimony tends to contradict the other witnesses, and tends to show that he died of disease. That is a question for you,—whether it does, or how far it does, if it does. Dr. Mann testified that he didn't contemplate poisoning at the time he was attending this man; but that he had puffiness of the eyes, and a rapid and weak pulse, which he says would indicate poisoning by arsenic. From all this testimony you must decide whether he died of disease or not."

This was or might have been easily construed by the jury as an argument by the court against this theory of the defense; saying, in effect:

"Why, gentlemen, Dr. Mann didn't think of poison while he was there, but he admits that Vanderhoof had symptoms of arsenical poisoning."

This was uncalled for, and injurious to the respondent, and not warranted by the evidence of Dr. Mann.

It seems to me that the court all through his charge gave undue prominence to the testimony of Dr. Palmer and other experts in his reference to the evidence, and that such references were harmful to the respondent's case. And the questions permitted to be put to these experts in the course of the trial were unfair and misleading. For instance, the first question submitted to Dr. Scott confined the symptoms to the point almost of the death of Vanderhoof, as did also the other question propounded to the same witness, both of which have heretofore been set out in full in this opinion. Before these questions were asked, the people themselves had shown, by Dr. Mann and other witnesses, the condition of Vanderhoof from the middle of September to the time of his death, and also the existence, long before, of these spells, which indicated, as Vanderhoof and the physician thought, heart trouble. No reference was made either to the condition of the heart as before noted, or the enlargement of the right ventricle, as testified to by Dr. Hendrix.

It was the duty of the prosecution to lay the whole case of this man's sickness and death, as they had made it, before these experts, or so much of it as had an important bearing upon his death, instead of picking out detached portions of it to suit their theories of the case. The whole of the undisputed important facts of the last sickness, and those developed at the *post mortem*, should have been embraced or summarized in the hypothetical questions leading to and inquiring as to the cause of death. But this was not done, nor fairly attempted to be done. Important facts were left out, and some things inserted

that were not facts, and could not consistently be claimed to be facts within the testimony.    It is impossible to particularize all these omissions or the insertions of facts. Nor is it necessary to do so.

Nearly all the hypothetical questions propounded by the people to the medical experts confined the symptoms of the deceased to 12 or 20 hours before his death, ignoring his condition and ailments previous thereto, and gave only a partial statement of the results of the *post mortem*. The difficulty of the heart, with which Vanderhoof thought he suffered so long, was studiously avoided, as was the diseased condition of the heart as shown by the autopsy. I believe that even in a civil case all the undisputed facts of a case must be included in a hypothetical question, both as a matter of sound principle, and of reason and justice.    Neither party has a right to discard an important undisputed fact because the insertion of such fact may alter or vary the answer or opinion of the witness, to the prejudice of such party.    Expert testimony is only allowed upon the theory that it is necessary in some cases, where the jury cannot be supposed to comprehend the significance of facts shown by other testimony, which needs scientific or peculiar explanation by those who do comprehend it.    *People v. Millard*, 53 Mich. 75 (18 N. W. Rep. 562)

This explanation cannot well be given so as to be of any worth or usefulness, especially in the diagnosis of disease, without all the facts known to exist are made the basis and foundation of the opinion.    So much may a single fact or symptom present or wanting change or vary such opinion that the courts uniformly hold that, if the jury find one single material supposed fact included in a hypothetical question wanting, they must discard and reject the answer to the question as worthless.    It has been said that in civil cases it is not necessary to state all th.

facts; that the party may assume such facts as he chooses to suit the theory of his case; and that the evil arising or liable to arise from such a practice can be remedied by a presentation of the omitted facts upon cross-examination, and that the jury will determine from the skill of the witnesses, and all other circumstances, the weight to be given to the answers to such questions.[1]

But every one who has been in active practice at the bar, or who has presided at trials, or reviewed records in the appellate courts as a judge, for the last 10 years in criminal cases, knows full well that, when an expert has once fixed his stakes upon the cause of death in an answer to the first hypothetical question propounded to him, no subsequent presentation of other facts, or elimination of some contained in the question, upon cross-examination, can easily move him from his first determination. He is on the alert at once to guard and bolster up his opinion, his professional pride is aroused, he seems to feel that his professional reputation is at stake, and he is sometimes the best attorney the party who employs him has in the trial of the cause. This is unfortunate, but it seems to be human nature in most cases. And the professional expert has become to be a recognized factor in criminal trials; and his pay for his services ranks, as it well may if the price of the services is to be measured by their value, with, and ofttimes above, that of the attorneys.

This being the fact, which cannot be gainsaid, justice and humanity demand that in a criminal case, where life, liberty, and reputation are at issue, the prosecuting officer, in examining an expert, should lay before such expert fairly and fully every material fact undisputed that can have a possible bearing upon the opinion of such witness.

---

[1] For cases treating on expert testimony in civil cases, see 69 Mich. 400, 430.

71 MICH. 12.

To permit, as was done in this case, a culling of facts to suit the purposes of conviction, to be propounded in hypothesis to the experts, and then to instruct the jury that the only way to contradict the opinion of the experts is by the opinion of other experts, is to deny a fair trial, and, in a case where the accused was unable to procure experts because of poverty, would be an outrage, and a reproach to our jurisprudence.

It has time and time again been said in this Court that the duty of the prosecuting attorney is not to distort or withhold evidence in order to convict. He is the representative of the people, of which the accused is one, and his duty is to fairly and fully lay before the jury every fact and circumstance known to him to exist, without regard to whether such fact tends to establish the guilt or innocence of the respondent. This is his whole duty,—no more, no less.

Complaint is also made that while the examination of the witnesses by the prosecution, and the entire conduct of the people's case, went upon the theory that the deceased came to his death from acute or subacute poisoning, to wit, the administration of large doses or fatal doses from 12 to 24 hours before death, and this was the case the defense was called upon to meet and did combat, yet the circuit judge submitted the case to the jury upon the theory of slow or chronic poisoning, commencing first in September, and that he misstated the testimony also in so doing.

We do not think the charge is fairly open to this complaint. The court, in stating what the people claimed, it is true, did state a case of slow poisoning, and, perhaps, in enumerating the facts claimed by the people, mentioned some things which were not proven. But the claim of the people, as made in their opening or in their argument to the jury, is not before us, and the court may

have correctly stated the case as made by them. It is evident, from an examination of the record, that the progress of the trial indicated the theory of the people to be a claim of acute poisoning, but there was some evidence introduced looking towards chronic poisoning. If the attention of the court and counsel had been specifically called by the attorneys for the defense to this matter, we might, perhaps, be able to determine whether error was committed by the court in this respect. As it is, the people may have claimed, as they might have done under some of the testimony, that there was chronic or slow poisoning up to November 28 or 29, when larger and fatal doses were administered.

We do not find any error in the rulings as to medical books. The court seems to have followed as consistently as possible the rulings of this Court. See *Pinney v. Cahill*, 48 Mich. 584 (12 N. W. Rep. 862); *Marshall v. Brown*, 50 Id. 148 (15 N. W. Rep. 55); *People v. Millard*, 53 Id. 77 (18 N. W. Rep. 562).

The expert has, or may take, perhaps, advantage of his position, under these authorities, and state that his opinion is derived from standard works; and if he fails to remember what particular books he has read, or what particular books he has culled his authority from, there is, under the previous decisions of this Court, no way in which to contradict the assertion he makes. But it is the settled law of this State that the contents of medical books cannot be got before the jury, unless, as in the case of *Pinney v. Cahill, supra,* the expert is unwise enough to state that a certain book lays down a certain proposition. The fact that an expert witness can, if he be shrewd enough, carry an idea to the jury that he has fortified his opinion upon a given state of facts by an extensive reading of medical authorities, and yet keep himself clear from any contradictions from the books themselves, is

another potent reason why this kind of evidence should be closely hedged and confined within its legitimate sphere, and that no unfairness should be permitted in its presentation to a jury. Unless it is so kept within bounds, and closely scanned and weighed by a jury, there is the greatest danger of a perversion of justice.

We do not feel called upon to notice the other assignments of error, as, in a general way, we have discussed the principal points argued before us.

It follows from what has been said that the verdict and judgment against the respondent must be vacated and set aside, and a new trial granted.

She will be remanded to the custody of the sheriff of Berrien county until bail is obtained, which will be granted by the circuit court of said county in the sum of $3,000.

SHERWOOD, C. J., concurred with MORSE, J.

CHAMPLIN and LONG, JJ., concurred in the result.

CAMPBELL, J., did not sit.