107 348
136 1459

107 348
141 1314

107 348
j144 1133

107 348
f155 1517
f155 1538

107 348
157 1113

## PEOPLE v. SEAMAN.

1. CRIMINAL LAW—INTENT—PROOF OF OTHER OFFENSES.

While it is a general rule that, on a trial for a felony, the prosecution will not be permitted to give evidence tending to prove the respondent guilty of another distinct and independent felony, still, where a felonious intent is an essential ingredient of the crime charged, and the act done is claimed to have been innocently or accidentally done, or by mistake, or the result is claimed to have followed an act lawfully done for a legitimate purpose, or there is room for such an inference, it is proper to characterize the act by proof of other like acts producing the same result, as tending to show guilty knowledge, and the intent or purpose with which the particular act was done, and to rebut the presumption that might otherwise obtain.

2. SAME—ABORTION.

Thus, on a prosecution for manslaughter in committing an abortion, where the proof of guilt is circumstantial, the theory of the defense being that the premature birth was due to accidental causes, evidence that the respondent had performed other abortions in the same house is admissible to show guilty knowledge and intent.

3. ABORTION—TRIAL—ELECTION OF COUNTS.

Where an information for manslaughter in procuring an abortion contains three counts, charging, respectively, the use of drugs, the use of an instrument, and the employment of means unknown, an election by the prosecution of the count relied upon for a conviction, made upon the submission of the case to the jury, sufficiently protects the rights of the respondent.

4. SAME—SUFFICIENCY OF EVIDENCE.

Evidence reviewed, and held to be sufficient to support a conviction.

5. SAME—EVIDENCE.

In a prosecution for manslaughter by abortion, evidence that, after the death of the woman, a registered letter was delivered at the place where she was staying, containing a money order payable to her order, that respondent indorsed the order in her name, and that the money was obtained thereon, is admissible to show that the statements made by the respondent in a death certificate subsequently issued by him, giving another name for the deceased, were knowingly false.

6. SAME—INSTRUCTIONS TO JURY.

In such a case, the refusal of an instruction that, if the jury believe that the deceased aborted from natural causes, or by reason of the ordinary sickness and vomiting, augmented by the sickness and vomiting of a sea voyage, together with nervous excitement, fatigue, lack of nourishment, and change of climate, respondent should be acquitted, is erroneous, where there is evidence in support of such theory.

7. SAME—EXPERT TESTIMONY.

An instruction in such case that the testimony of expert witnesses is exposed to a reasonable degree of suspicion, and that, by giving too much weight thereto, juries have been induced to render unwarrantable verdicts, is reversible error, where. the respondent relied upon such testimony to support his theory that death resulted from natural causes.

8. EXPERT WITNESSES—CREDIBILITY.

While the testimony of experts is not always the most reliable, and, comparatively, it has been held to have little value, such witnesses are to be judged from the same standpoint as other witnesses, and the fact that they are employed, or that they differ in their conclusions, does not justify the assumption, as a matter of law, that their testimony is open to suspicion.

9. SECONDARY EVIDENCE—INSTRUMENT BEYOND JURISDICTION OF COURT.

Parol evidence is. admissible to show the nature of a cablegram which is without the jurisdiction of the court, efforts having been made to obtain it.

10. COMMON-LAW MARRIAGE—VALIDITY.

A marriage contract, without ceremony, cannot be valid if a ceremonial marriage would be unlawful under the same circumstances, as where one of the parties has a husband or wife living.

Exceptions before judgment from recorder's court of Detroit; Chapin, J. Submitted November 22, 1895. Decided December 10, 1895.

Dennis J. Seaman· was convicted of manslaughter. Reversed.

*Fred H. Warren* and *Levi J. Fick*, for appellant.

*Allan H. Frazer*, Prosecuting Attorney, and *Ormond F. Hunt*, Assistant Prosecuting Attorney, for the people.

McGRATH, C. J. Respondent was informed against, jointly with one Alice Lane, under 2 How. Stat. § 9107, for manslaughter. He demanded and had a separate trial. The first count charged the use of drugs, the name and component parts of which are unknown; the second charged the use of an instrument, the name of which is unknown; and the third charged the employment of means, the nature of which is unknown.

The testimony for the people tended to show that Emily Hall went to the house of Alice Lane about midnight of January 23, 1895; that on Tuesday, January 29th, she was delivered of a fœtus four to six months gone; that on Sunday, February 3d, she died; that her body was removed at midnight, Sunday night, to an undertaker's; that it was then placed on the cooling board and embalmed; that the body was not buried, but remained at the undertaker's for over two months; that a reporter for one of the daily papers discovered its presence there, the attention of the authorities was called to it, and on April 15th a coroner's inquest was held, resulting in the arrest of the parties charged. The testimony further tended to show that Emily Hall came from England; that she came to Detroit upon a pre-arrangement made by one Jonathan Bell; that upon her arrival in Detroit she went direct to the Lane house; that Dr. Seaman was informed of her arrival on Friday, January 25th; that he visited her from time to time until her death; that he was present from 9 o'clock in the morning on Sunday, February 3d, until after her death; that he went personally to the undertaker's office, and arranged for her burial; that he accompanied the undertaker to the house, obtained the body by way of the alley in the rear of the house, and returned with the undertaker and the body to the undertaker's place of business; that he made out and gave to the undertaker the required death certificate, which gave the name of decedent as Myrtle Cook, her birthplace as New York, the cause of her death as pneu-

monia, the duration of her disease as one week, the place of death as 608 Piquette avenue, Ninth ward. Deceased had not been known by any one at the house or elsewhere by the name given, and she died at 630 Lincoln avenue. That, after the discovery of the body at the undertaker's, respondent told two reporters that at 6 o'clock on Sunday evening, February 3d, a strange gentleman called at his office, and requested him to visit a lady who was very sick with pneumonia; that he asked the stranger why he did not call his family physician, and he said he had discharged him; that he finally consented to go; that the stranger called a hack, and he went with him, and found the lady so ill that respondent told the stranger that she would die that night; that the stranger called the next day, and represented that the girl's name was Myrtle Cook, and he signed the certificate of death.

It further appeared that, before the inquest, respondent tried to prevail upon the coroner not to hold an inquest, claiming that it was unnecessary; that, at the time of respondent's arrest, there were found secreted upon his person a number of letters from Bell, in England, addressed to Emily Hall, en route to Detroit, and at Detroit; that these letters were in the handwriting of Jonathan Bell; that said Bell had, a short time previously, visited this country, and had spent some time in Detroit. The letters contained explicit directions as to the Lane house; the decedent's condition; referred to an advertisement of the house in one of the Detroit papers; to the fact that deceased could submit to an immediate removal of the child, or could remain there until the natural course of events; to her expenses; and to remittances for the home voyage after the event. One of the letters contained a copy of a letter from Alice Lane, proposing to give board, room, medical attendance, etc., from time of arrival, for $50. "Adoption fee, if born outside of our hospital, and we take it in, $25 cash. We also will treat you, if you are not too far gone, perfectly

safe, for the same money. Will only require you here about ten days for the treatment." It also appeared that, after the death, a letter came to the Lane house, addressed to Emily Hall, inclosing a draft payable to the latter's order; that this draft was taken to respondent, and he indorsed the name of "E. Hall" thereupon, and the Lanes obtained the money thereon, and, by arrangement in which respondent took part, a messenger was sent to Buffalo to send from there a cablegram to Bell in England, and such cablegram was sent; that, before the coroner's inquest, a written statement was prepared by respondent, giving a theory of Emily Hall's appearance at the Lane house, setting forth that she came there before the holidays, and that the child was born alive, and was given to one of the inmates of the house; that this statement was submitted to Alice Lane, Herman B. Lane, and Rose Ryan (the latter, one of the inmates of the Lane household), as the story which was to be told at the inquest, and the suggestions were followed out.

At the inquest, respondent was sworn, and testified that he first saw Myrtle Cook some time before Christmas at his office; that she then told him she was pregnant; that she asked him if he could refer her to some place where she could be kept; that he asked her how much money she had, and, on learning the amount, he told her that the sum was insufficient; that he asked her to call again; that in the meantime he saw Mrs. Lane, and when the patient called he directed her to Mrs. Lane's; that he did not see her again till January 6th, when he was telephoned for and visited her, delivering her of a full-grown, nine-months child; that he called three successive days afterwards, and left her doing well; that about 10 days afterwards he was again telephoned, and went up, and found that she had a light attack of grippe; that he did not call again for some days, but was sent for a few days before she died, and continued to attend her until her death, which was caused by pneumonia and heart

failure. On being questioned relative to his statements made to the reporters, he said:

"The reporter Schmedding was the first. I don't know him. He wore glasses. Came and asked me some questions. I told him what I felt like telling him. I told him lies, because it was none of his business. I told the officers the same as I told him. I thought it was none of their business, and nobody's business.

"*Q.* The officers of the law, who are here to protect the lives and property of the people,—it was none of their business?

"*A.* Certainly not. No one could compel me to tell them.

"*Q.* How did you come to put 608 Piquette avenue on there?

"*A.* At Mrs. Lane's suggestion. I asked what the alley behind the house was,—about opposite what number it would come,—and she said 608 would be about, and we just guessed at it. I knew this place was not 608 Piquette avenue. I knew it was false when I signed it. I filed it in the health office, and it was accepted. They didn't know the difference, so far as I knew. Myrtle Cook didn't tell me she was 31 years old. We just made a guess about that; at least, I think it was a guess. I didn't say she came to my office the day before Christmas; it was some time before Christmas, and this was the first I ever saw of her. I know nothing about her relatives or friends, and have learned nothing since. Somebody—I think it was Mrs. Lane—told me she had been at Bay City. I put down place of birth of deceased, New York, because I didn't know what else to put down. I don't know how the Ninth ward came in there. That is a clerical error.

"*Q.* Wouldn't that help to deceive still more?

"*A.* Why, no, if they were very cute in the health office. I gave the officers a bluff answer as to where this place was. I didn't tell them whether it was east or west. I didn't because I didn't know. I did give the reporter a stiff about going out in a coupé, and I didn't know where I was going.

"*Q.* Didn't you say they had their family physician, and you only went up there—

"*A.* (interrupting). I admit the whole thing on that occasion was a stiff and a bluff. I had a right to bluff them, if I felt so inclined.

"*Q.* Do you think you have the right to make a false report to the health office of the city?

"*A.* Certainly, I knew it.

"*Q.* You think you had the right to make a false certificate?

"*A.* If I wanted to.

"*Q.* Didn't you tell Officer Lally you got this number 608 from the man that came there?

"*A.* That is right, but that has nothing to do with it. The question now is different. I had no right to tell professionally, but, since they have told, I have a right to.

"*Q.* When did you begin telling the truth?

"*A.* I told the truth when I went to see Capt. Baker; not before. That was last Tuesday afternoon. I also told the truth to my attorney, and I am at it now. I wasn't under oath then, you know.

"By Mr. Fick: *Q.* What you have said in regard to the misrepresentations you made to the reporter and to Mr. Lally, were they made to conceal anything on your part?

"*A.* Not in the least; simply to protect the Lanes. I proposed to maintain it under my professional seal of secrecy as long as I could, and did until the Lanes gave it away. I then was at liberty to give it away."

A post mortem was held, in which several physicians participated. The examination was directed to the lungs and uterus. All agreed that there was no perceptible laceration of the parts, and no evidence of the use of instruments; that there had been an expulsion of the fœtus; that the size of the womb at that time was that of a 3 or 4 months' pregnancy; that the process of involution ordinarily begins immediately after the expulsion, but that the contraction is sometimes delayed by after sickness; that a fœtus begins to quicken at 4 or 4½ months, and that a fœtus 9½ inches long would indicate at least 5 months' growth. One physician was positive that pneumonia was not the cause of death; another thought that he detected evidence of septicæmia; while two others say that, by

reason of the condition of the body, it was impossible to say whether either pneumonia or septicæmia was the death cause.

Counsel put to certain of the physicians the following questions:

"Doctor, supposing a young woman, 25 or 26 years of age, residing in a little hamlet in England, becomes pregnant by her pastor, in whose church she has been an active worker. After discovering her condition, she deems it necessary to leave her own country, and come to a foreign land. She takes second-cabin passage for New York in the month of January. On the passage over she suffers from sickness and nausea, so much so that she is unable to eat, and keeps her berth most all of the time during the trip over. She lands in New York, and takes the train for Detroit, arriving here in the middle of a cold, stormy night. After some little time she finds her way to her place of destination. The next morning, she is up and eats breakfast, but complains of being unwell. For the two days following her condition does not appear, but after that she develops these symptoms,—chills, fever, headache, pains in the limbs—

"*A.* Let me interrupt. Did you say two days after?

"*Q.* Two days after the first,—within three or four days after her coming. She develops these symptoms,— chills and fever, headache, pain in the limbs, and palpitation of the heart. These symptoms continue for a period of two days longer, when she gives birth to a fœtus that shows no signs of life. Now, remembering her social condition, her trip across the ocean, the common vomiting of pregnancy augmented by the vomiting and nausea of a sea voyage, nervous and mental excitement consequent upon leaving her own country and coming to a foreign land, her inability to eat, the fatigue of the voyage, going into a strange climate, these symptoms she developed after coming here, and the premature discharge of the fœtus,— in the absence of any testimony of a criminal operation for the production of that miscarriage, what would you say was the cause of it?"

One witness answered as follows:

"I would say, most decidedly, it was due to those con-

ditions you mentioned. There is no evidence of any instrument?

"*Q.* No evidence of any criminal operation. What symptoms would you expect to find in a woman carrying a dead foetus?

"*A.* At what time?

"*Q.* When she had carried it long enough to develop any symptoms.

"*A.* Increased temperature, chills, lassitude, feeling of heaviness, headache, vomiting, weight in the abdomen, sometimes diarrhea."

Another witness said:

"It might be— It would be caused, of course, by all these symptoms.

"*Q.* These conditions?

"*A.* Yes.

"*Q.* Might the membrane be ruptured?

"*A.* Yes; quite likely.

"*Q.* Water escape?

"*A.* Yes.

"*Q.* Foetus die?

"*A.* Yes.

"*Q.* How long might she carry it before it is expelled?

"*A.* She might carry it quite a while,—several weeks. She might not carry it a day.

"*Q.* The question that I put to you shows the abortion to have taken place on the sixth day after her arrival. With all the conditions, symptoms, etc., of this question, please tell the jury what you think was the cause of the premature birth of the foetus in this case.

"*A.* These things would bring on pains, and the pains, of course, would rupture the membrane, and, of course, that would bring on the abortion sooner or later. * * * The symptoms you have described are the ones I would expect to find in a woman carrying a dead foetus."

Another witness said:

"There is certainly a history there sufficient to cause the child's death, and perhaps the woman's death, from those conditions."

One of the people's witnesses testified that she was in the Lane house at the time, that Emily Hall dropped the

fœtus in the watercloset bowl, that the witness saw it, and that it was about 9½ inches long.

A witness testified that she (witness) gave birth to a child in the Lane house on Tuesday evening, January 22, 1895. Another witness testified that respondent operated upon her with instruments at the Lane house on January 23, 1895, and that she was 4 months gone at the time. Another witness testified that respondent operated on her at the Lane house in June, 1894, and took from her a 3½ months' fœtus, and that he operated on her again in October, 1894, at the same place, and took away a fœtus 6 weeks old. It is insisted that the court erred in the admission of the testimony of the last-named three witnesses.

The general rule is that evidence shall be confined to the issue, and that on a trial for felony the prosecution will not be permitted to give evidence tending to prove the defendant guilty of another distinct and independent felony. There are, however, exceptions to this rule. The other offense may be part of the *res gestœ*, or the proof thereof may be admissible to show motive. *People* v. *Marble*, 38 Mich. 117; *Phillips* v. *People*, 57 Barb. 353; *State* v. *Braunschweig*, 38 Mo. 587; *Burr* v. *Com.*, 4 Grat. 534; *Heath's Case*, 1 Rob. (Va.) 735; *Rex* v. *Clewes*, 4 Car. & P. 221; *Brown* v. *Com.*, 76 Pa. St. 319; *Johnson* v. *State*, 17 Ala. 618; *Com.* v. *Sturtivant*, 117 Mass. 123. Where it is necessary to show a particular intent in order to establish the offense charged, proof of previous acts of the same kind is admissible for the purpose of proving guilty knowledge or intent, or, where it is claimed that the thing done was the result of an accident, proof of other like occurrences under like conditions has been held admissible; as where the question is whether a fraud has been perpetrated,—for instance, where a vendee of goods is alleged to have procured the sale of goods by misrepresentation (*Kost* v. *Bender*, 25 Mich. 515; *Beebe* v. *Knapp*, 28 Mich. 53; *Shipman* v. *Seymour*, 40 Mich. 275; *Cook* v.

*Perry*, 43 Mich. 623; *Dayton* v. *Monroe*, 47 Mich. 193;
*Dibble* v. *Nash*, Id. 589; *Stubly* v. *Beachboard*, 68 Mich. 401;
*Hall* v. *Naylor*, 18 N. Y. 588; *Hennequin* v. *Naylor*, 24 N.
Y. 139; *Miller* v. *Barber*, 66 N. Y. 558; *Blalock* v. *Randall*,
76 Ill. 224; *Rowley* v. *Bigelow*, 12 Pick. 307; *Bottomley* v.
*U. S.*, 1 Story, 135; *U. S. Life Ins. Co.* v. *Wright*, 33 Ohio
St. 533), or under an indictment for obtaining goods or
money by means of false pretenses *(Bielschofsky* v. *People*,
3 Hun, 40, 60 N. Y. 616; *Mayer* v. *People*, 80 N. Y. 364;
*Weyman* v. *People*, 4 Hun, 511; *Com.* v. *Coe*, 115 Mass. 481;
*Reg.* v. *Francis*, 22 Wkly. Rep. 663, 10 Alb. Law J. 120,
L. R. 2 C. C. 128), or for knowingly receiving stolen prop-
erty (*Coleman* v. *People*, 55 N. Y. 81; *Copperman* v. *People*,
56 N. Y. 591; *State* v. *Harrold*, 38 Mo. 496), or for embez-
zlement (*Reg.* v. *Richardson*, 2 Fost. & F. 343; *Reg.* v. *May*,
1 Cox, Cr. Cas. 236; *Reg.* v. *Proud*, Leigh & C. 97), or
under indictments for uttering counterfeit bills, or having
in possession counterfeit money or counterfeiting apparatus,
with intent, etc. (*Reg.* v. *Forster*, Dears. Crown Cas. 456;
*Rex* v. *Ball*, 1 Camp. 324; *Reg.* v. *Weeks*, Leigh & C. 18;
*Reg.* v. *Zeigert*, 10 Cox, Cr. Cas. 555; *Com.* v. *Price*, 10
Gray, 472; *Com.* v. *Coe*, 115 Mass 481). In arson cases,
evidence has been admitted as to previous attempts to fire
the same building or contiguous buildings, or to show other
incendiaries under like circumstances, involving the pres-
ence of the prisoner in the locality. *Reg.* v. *Bailey*, 2 Cox,
Cr. Cas. 311; *Reg.* v. *Dosset*, Id. 243; *Reg.* v. *Taylor*, 5 Cox,
Cr. Cas. 138; *Reg.* v. *Briggs*, 2 Moody & R. 199; *Rex* v.
*Moore*, 2 Car. & P. 235; *Kramer* v. *Com.*, 87 Pa. St. 299;
*Com.* v. *McCarthy*, 119 Mass. 354; *Com.* v. *Bradford*, 126
Mass. 42.

Some of these authorities would seem to be border
cases, but they illustrate the tendency of the courts to
allow the introduction of this class of testimony to repel
the inference that the cause was an accidental one, in
cases where such an inference might otherwise obtain.
Upon principle and authority, it is clear that where a
felonious intent is an essential ingredient of the crime

charged,, and the act done is claimed to have been inno-
cently or accidentally done, or by mistake, or when the re-
sult is claimed to have followed an act lawfully done for
a legitimate purpose, or where there is room for such an
inference, it is proper to characterize the act by proof
of other like acts producing the same result, as tending to
show guilty knowledge, and the intent or purpose with
which the particular act was done, and to rebut the pre-
sumption that might otherwise obtain. *Reg.* v. *Roden*, 10
Moak, Eng. R. 511; *Reg.* v. *Cotton*, 5 Moak, Eng. R. 479;
*Reg.* v. *Geering*, 18 L. J. Mag. Cas. 215; *Reg.* v. *Garner*, 3
Fost. & F. 681; *Rex* v. *Voke*, Russ. & R. 531; *Stout* v. *Peo-
ple*, 4 Park. Cr. R. 71; *Osborne* v. *People*, 2 Park. Cr. R.
583; *Dunn* v. *State*, 2 Ark. 229; *Pierson* v. *People*, 18 Hun,
239; *State* v. *Watkins*, 9 Conn. 47; *Com.* v. *Blair*, 126 Mass.
40; *Com.* v. *Corkin*, 136 Mass. 429; *Weed* v. *People*, 56 N. Y.
628; *Hays* v. *State*, 40 Md. 633; *Reg.* v. *Dale*, 16 Cox, Cr.
Cas. 703.

In Wharton's American Criminal Law (6th Ed., § 649),
it is said:

"Where the *scienter* or *quo animo* is requisite to, and
constitutes a necessary and essential part of, the crime
for which the person is charged, and proof of such guilty
knowledge or malicious intention is indispensable to es-
tablish his guilt in regard to the transaction in question,
testimony of such acts, conduct, or declarations of the
accused as tend to establish such knowledge or intent is
competent, notwithstanding they may constitute in law a
distinct crime."

And 3 Greenl. Ev. § 15, has the following:

"In the proof of intention, it is not always necessary
that the evidence should apply directly to the particular
act with the commission of which the party is charged,
for the unlawful intent in the particular case may well
be inferred from a similar intent proved to have existed
in other transactions, done before or after that time."

And in Stephen's Digest of Evidence, article 11 (7 Am.
& Eng. Enc. L. p. 61), the rule is laid down as follows:

"When there is a question whether a person said or did something, the fact that he said or did something of the same sort on a different occasion may be proved, if it shows the existence on the occasion in question of any intention, knowledge, good or bad faith, malice, or other state of mind, or of any state of body or bodily feeling, the existence of which is in issue, or is deemed to be relevant to the issue."

And in article 12 (7 Am. & Eng. Enc. L. p. 62) the same author says:

"When there is a question whether an act was accidental or intentional, the fact that such act formed part of a series of similar occurrences, in each of which the person doing the act was concerned, is deemed to be relevant."

See, also, 1 Greenl. Ev. § 53, and notes.

In *Reg.* v. *Roden*, a mother was charged with the murder of her infant by suffocation, and it was held admissible to show the death of her other children under similar circumstances.

On the trial of a wife for poisoning her husband with arsenic, proof of the subsequent death of her two sons from arsenical poisoning was admitted, with a view of enabling the jury to determine whether the taking of the poison was accidental or not. *Reg.* v. *Geering.*

In *Reg.* v. *Garner*, on the trial of a man and his wife for the murder of his mother by poison, the wife having been a servant in the family during the life of a former wife, evidence was admitted of the circumstances under which the former wife had died from poison.

In *Rex* v. *Voke*, upon an indictment for maliciously shooting, held that, if it be questionable whether the shooting was by accident or design, proof may be given that the respondent at another time intentionally shot at the same person.

In *Com.* v. *Corkin*, respondent was charged with using an instrument upon the body of a woman with intent to procure a miscarriage. Evidence that on subsequent occasions, within 10 days, defendant administered the same

treatment, was held admissible for the purpose of show-ing intent, and respondent's knowledge of the condition of the woman. The court say:

"Whether it was of acts which formed part of the prin-cipal transaction, or of acts of the defendant at other times, it tended to prove attempts of the defendant to procure the identical result charged; that is, to prove the intent which was charged in the indictment. Being com-petent to prove the crime charged, it is no objection that it also tended to prove other crimes."

In *Weed* v. *People,* respondent was indicted for pro-curing an abortion; and a circular introduced in evidence, which was issued and circulated by the accused, advertis-ing that he could be consulted, and advising females who should consult him how the same could be kept secret and they protected from criminal punishment, was held admissible as tending to show knowledge on the part of defendant of the character of the drugs administered, and their probable effect, and that he administered them for the purpose of procuring an abortion.

In *Hays* v. *State,* where parties were charged with pro-ducing an abortion, it was held proper to show the char-acter of the house,—that it was a house of ill fame.

In *Com.* v. *Blair,* on the trial of an indictment for pro-curing an abortion, evidence that, five months before the time of the alleged operation, defendant had in his posses-sion an instrument which he described as well fitted to procure an abortion, was held admissible as tending to show that defendant was in possession of the means of committing the crime.

In the case of *Rosenweig* v. *People,* 63 Barb. 634, defend-ant was charged with procuring an abortion upon B. He testified in his own behalf, and on cross-examination W. was pointed out to him, and he was asked if he knew her, and he stated that he did not, and had never seen her. He was then asked if he had not procured an abortion upon W., and answered that he had not. It was held that it

was not competent to impeach the prisoner as a witness by contradicting him as to facts disconnected with or collateral to the subject-matter at issue and on trial.

In *Baker* v. *People*, 105 Ill. 452, two persons were on trial for the offense; and it was held that the people should have been put to their election whether they would proceed against defendant B. alone for using the wire, or against both for what occurred at the house of defendant G. Under the statute of that state, intent is not made an ingredient of the offense, and in this respect the case is similar to *Albricht* v. *State*, 6 Wis. 74.

Our own State has frequently recognized the rule that, where it is necessary to show a particular intent in order to establish the offense charged, proof of previous acts of the same kind is admissible for the purpose of proving guilty knowledge or intent. *Carver* v. *People*, 39 Mich. 786; *People* v. *Marble*, 38 Mich. 117; *People* v. *Henssler*, 48 Mich. 49; *People* v. *Wakely*, 62 Mich. 297; *People* v. *Hawkins*, 106 Mich. 479.

The case of *People* v. *Sessions*, 58 Mich. 594, to which our attention is not called by the briefs of counsel, is directly in point. Respondent was charged with the death of Mrs. Peck, resulting from abortion performed by her. "The testimony of four of the people's witnesses relating to respondent's possession of instruments to produce an abortion, and her use of them, and her knowledge upon the subject, and that she held herself out for the performance of such service with the instruments, for hire, was given on the part of the prosecution. It consisted of conversations of respondent had with these four persons, extending through a period of four years previous to the death of Mrs. Peck, wherein the respondent stated to one that she had the instruments with which to perform abortion, had herself got rid of a number of children, and showed her the instruments; at the same time saying to the witness, if she wanted any help, she could help her. To another she stated that she had committed abortions,

and she could do it again; that she had the instruments to use in doing it. To another she stated her terms for performing such service, which she then proffered to the witness, who was in the family way, and told her she had the instruments for the purpose." The testimony was offered to show guilty knowledge and intent, and the possession of the necessary means to accomplish the act, and it was held competent.

Miscarriages do occur from accidental causes. Death follows, not only in cases of miscarriage and premature birth, but also in ripe cases of childbirth. Physicians are necessarily in attendance in such cases. Respondent had, at the coroner's inquest, testified that this was a case of childbirth, and subsequent death from pneumonia. He stated that he was called to the house, professionally, to attend a woman in confinement. It became necessary to show guilty knowledge and intent on his part. How else could the prosecution prove the *quo animo*,—the criminal purpose of his attendance,—except by showing the character of the place, the fact that it was a place of resort for such practices, and that respondent was frequently there, and for the very purpose of performing his part in these criminal operations? Unless indirect proof of guilty knowledge is admitted, it would be impossible, in many cases, to prove this essential element in the offense. As is said by Heath, J., in *Whiley's Case*, 2 Leach, 986:

"The charge puts in proof the knowledge of the prisoner, and, as that knowledge cannot be collected from the circumstances of the transaction itself, it must necessarily be collected from other facts and circumstances."

It is urged that the court erred in not compelling the prosecution to elect upon which count of the information the people relied. That election was made upon submission of the case to the jury.

The showing made entitled the people to have the name of the witness Greusel indorsed upon the information.

Herman B. Lane was not the husband of the co-respond-

ent, Alice Lane. A marriage contract, without ceremony, cannot be valid under circumstances in which a ceremonial marriage would be unlawful.[1]

The court did not err in admitting evidence of the delivery of the registered letter to Mrs. Lane, or of its contents, the money order, or of the indorsement made thereon by defendant, or of the cashing of the order, or in admitting the order itself. Respondent was connected with the letter and order. It was competent to show that he knew decedent's name, and where she came from, and that the statements made in the death certificate used at the coroner's inquest were knowingly false.

The cablegram was without the jurisdiction of the court, an effort was made to obtain it, and the parol evidence was admissible to show its nature.

There is no force in the contention that the evidence was insufficient to warrant a finding that Emily Hall was pregnant when respondent treated her, that the fœtus was quick, that an abortion had been performed, and that death ensued in consequence.

We are compelled, however, to reverse the case on other grounds.

Counsel for defendant requested the court to instruct the jury that—

"If the jury believes that Emily Hall aborted from natural causes, or from any one of the several causes testified to by the medical witnesses in the case, then you should find the respondent not guilty.

"If the jury believes that Emily Hall aborted by reason of the ordinary sickness and vomiting, augmented by the sickness and vomiting of a sea voyage, together with the nervous, mental excitement, fatigue, lack of nourishment, and the change of climate, then you should find the respondent not guilty."

These requests should have been given. The testimony tending to prove the body of the crime was circumstan-

---

[1] The objection raised was that Herman B. Lane was disqualified as a witness. The parties had been living together as husband and wife, but the respondent Lane had a lawful husband then living.

tial.   The theory of the defense was that death resulted
from natural causes.   That theory should have been sub-
mitted to the jury.   *People* v. *Cummins*, 47 Mich. 334.

The court instructed the jury that—

"Some expert testimony has been given in this case,
but its value depends upon the circumstances, and of
these circumstances the jury must be the judges.   The
jury must determine the weight to be credited to it, but
in all cases the testimony of experts is to be received and
weighed with great caution. 'The evidence of a witness
who is brought upon the stand to support a theory by
his opinion is testimony exposed to a reasonable degree
of suspicion, which there is great reason to believe is in
many instances the result of employment and his bias
arising out of it.   In many cases, it is to be feared, by
giving too much weight to testimony of experts, juries
have been induced to render unwarrantable verdicts, dis-
creditable to the administration of justice, as well as ex-
ceedingly detrimental to public interests."

This instruction was clearly erroneous.   An expert
witness is to be judged from the same standpoint as any
other witness.   *Turnbull* v. *Richardson*, 69 Mich. 400;
*People* v. *Vanderhoof*, 71 Mich. 158.   It was for the jury,
and not for the court, to determine the weight to be given
to the testimony.   *Maynard* v. *Vinton*, 59 Mich. 139.   As
has already been said, the evidence as to the death cause
was circumstantial.   An autopsy had been held for the
very purpose of determining the cause.   Two experts had
been called by the people to testify as to the result of that
examination, and it must be conceded that these wit-
nesses were better qualified to determine what symptoms
usually precede a miscarriage, and what are the ordinary
causes which produce it, and what the condition of the
body indicated upon the examination made, than is the
ordinary layman.   In *People* v. *Millard*, 53 Mich. 63, it is
said that—

"Upon medical questions, while persons may testify
whose knowledge is chiefly theoretical, there can be no
question of the superior value of practical knowledge,

combined with theoretical, especially on such matters as involve the interpretation of symptoms and actions of the sick."

Expert testimony is not always the most reliable, but it is often indispensable. Its infirmity arises largely from its character. Comparatively, it has been held to have little value. *Treat* v. *Bates*, 27 Mich. 390; *Viets* v. *Railway Co.*, 55 Mich. 120; *Stone* v. *Railway Co.*, 66 Mich. 76. Suppose that these witnesses had found evidences of a criminal operation upon the body, or suppose that some of them had so testified, and that others had said otherwise; would the court have been justified in giving the instruction here complained of? It does not follow, because experts differ, that the testimony should be said to be suspicious. Lay witnesses differ materially in their testimony as to conversations and occurrences. Judges, lawyers, and juries differ in their constructions from a given state of facts. It cannot be assumed, as a matter of law, that this class of testimony is open to suspicion, for the reason that experts are employed, and are necessarily biased by such employment. The other circumstances of the case bearing upon the death cause and defendant's guilt were for the jury, and it was their province to determine those questions from all the facts and circumstances, and to disregard the opinion evidence as to the cause of death, if, in their judgment, the other testimony warranted that conclusion.

The court very properly instructed the jury that unfavorable inferences were not to be predicated upon the fact that defendant did not take the witness stand, and we think that the remarks made by the prosecuting officers would not have been open to criticism if those officers had observed that rule.

For the errors referred to, the verdict must be set aside, and a new trial awarded.

The other Justices concurred.