PEOPLE v. MacGREGOR.

1. CRIMINAL LAW—TRIAL—JURY—CONDUCT OF PROSECUTOR.

Prejudicial error was not made to appear, on a murder trial, by the prosecuting attorney's asking one of the jurors, who had indicated that he had an opinion, whether he thought the respondent was guilty or innocent, the juror replying that he thought respondent was guilty, where but one of the jurors who sat in the case heard the expression of belief, and that one declared that the statement would have no effect on him, and did not make him form an opinion as to respondent's guilt: also, where respondent exercised only 12 of his 30 peremptory challenges.

2. SAME—ARRAY, CHALLENGE TO—JURY—IMPANELING JURORS.

Where respondent's attorneys challenged the array of jurors for the reasons that the number from some townships was deficient, that excessive lists were returned from other townships, and that no jurors had been returned from one of the townships, and the returns were in other cases defective, the court adopted the correct course by holding that the jurors from townships which returned insufficient lists could and should be corrected by striking off additional names below the requisite number; and omission to return any list from the two townships was not ground of challenge to the array.

3. SAME—EVIDENCE—HOMICIDE—SIMILAR OFFENSES.

On a trial for homicide, evidence that a brother of deceased had died of poisoning while he was under the care of respondent physician, and from the same drug, was properly received in evidence as having a bearing on the issue of intent, absence of mistake or accident and the identity of the guilty person. Respondent's sworn statement at the coroner's inquest, introduced in evidence by the prosecution, that he had not administered any arsenic, did not make the evidence incompetent. Nor was the prosecution precluded from showing actual intent or malice because the law would imply intent to kill from the giving of a poisonous drug.

4. SAME—TRIAL—ERROR—SURRENDER OF ACCUSED BY SURETIES—PREJUDICIAL MISCONDUCT.

While it was improper for the sureties on the bond of one

who was jointly accused of murder with respondent to appear in court and in the presence of the jury surrender the accused, who procured new bail, the conviction should not be reversed, since the prosecutor had nothing to do with the transaction and it was problematical whether prejudice resulted.

5. SAME—EVIDENCE—HYPOTHETICAL QUESTIONS—POISONS.
No error resulted that prejudiced respondent, who admitted that there was evidence of poisoning by arsenic, from the reception in evidence of the opinions of three experts, that death was caused by arsenical poisoning.

6. SAME—CONSPIRACY.
Nor was it error to receive evidence of statements made by the victim's mother, who was charged with complicity in the offense and with conspiring together with the respondent, relating to her attitude towards the respondent, for the purpose of showing her feelings toward him.

7. SAME—TRIAL—CONDUCT OF PROSECUTING ATTORNEY.
Expressions of his belief, employed by the prosecuting attorney in his argument, and withdrawn when objected to, were not prejudicial, especially when the court instructed the jury that the claims of the respective counsel were not in evidence, and the verdict should be based upon the testimony.

8. APPEAL AND ERROR—ASSIGNMENTS.
Assignments of error to the effect that the court erred in the charge as given in a certain paragraph, which contained many correct statements of the law, were too general to merit consideration.

Error to Huron; Beach, J. Submitted November 11, 1913. (Docket No. 172.) Decided January 5, 1914. Rehearing denied June 4, 1914.

Robert MacGregor was convicted of murder. Affirmed.

*X. A. Boomhower,* Prosecuting Attorney *(E. A. Snow,* of counsel), for the people.

*George M. Clark (Walsh & Walsh,* of counsel), for respondent.

MICHIGAN LIBRARY

178 MICH. 438

STONE, J. The respondent was, by the information filed in this case, charged with the murder by poisoning by means of arsenic, of one Scyrel Sparling. He was convicted June 5, 1912, of murder in the first degree, and on June 10th was sentenced to the State prison for life.

The respondent at the time of the trial was about 36 years old. He was born near London, Ontario, where his father and some other relatives reside. In the spring of 1897 respondent graduated as a physician from the Western University in London, and went to Hildreth, Neb., where he practiced his profession for about 6½ years, and where he was married. In the fall of 1903 he left Hildreth and located at Burnside, Mich., about 40 miles from Ubly, and engaged in the practice of medicine there. About a year after that he came to Ubly, Mich., and purchased the practice of one Dr. Giffin and located there with his family, and was living there as a practicing physician for about seven years before his arrest upon the charge in this case. Ubly is a small village about six or seven miles from Bad Axe, Huron county. Respondent's father is an old resident of London, Ontario, and district manager of the Sun Life Insurance Company. Respondent also has a brother who is a practicing physician at London. Respondent first became acquainted with the Sparling family, of which Scyrel was a member, about May, 1907, when he was called to attend Mrs. Sparling; that was about 4½ years before his arrest in this case. At that time John Wesley Sparling, the father of the family, was alive. The father died in 1908. Peter Sparling died when 24 years of age, July 10, 1910. Albert Sparling died when 23 years of age, May 3, 1911. Scyrel Sparling died when 20 years of age, August 14, 1911. Of this family there remain living Mrs. Sparling, the mother of the children, May Sparling Hurford, a daughter, and Ray

Sparling, a son, who was 22 years of age at the time of the trial of the respondent. From the time the respondent, Dr. MacGregor, commenced treating Mrs. Sparling, in 1907, he continued as the family physician of the Sparling family until shortly after Scyrel's death.

Counsel upon neither side have complied with Rule 40 of this court by making a concise statement of the facts of the case distinct from argument, and we have found it difficult, owing to the length of the record, to gather a succinct statement of the facts. The importance of the case is such, however, that we have endeavored to glean from the record a fair statement of the prominent facts in the case.

There was evidence that Scyrel Sparling was taken sick August 4, 1911, and died ten days thereafter. The respondent was first called on the night of August 4, 1911, and he continued to be in attendance until the time of death. On the 5th day of August, 1911, Dr. Herrington of Bad Axe, a physician and surgeon of 30 years' practice, was called by the respondent in consultation in the case. Dr. Herrington inquired of the respondent as to the history of the case, and was informed by him that Scyrel had been taken sick with vomiting, with a good deal of pain in his stomach, followed by diarrhea while on his way home from Ubly. Dr. Herrington testified that he examined the patient at that time, took his pulse, temperature, and respiration, examined his chest, more particularly his abdomen, as there was where most of the trouble was directed. He testified that the patient had no fever, his pulse running between 90 and 100, and the doctor stated that if he were called to see a case of that kind he would possibly give something to clear his bowels, then give him a sedative, such as bismuth, to quiet the diarrhea. Dr. Herrington then stated that he saw no reason why the boy should not recover from the appearance of him at that time. But the respondent

stated that other members of the family had been taken sick in the same way and had died. Dr. Herrington's exact language was:

"The doctor said that the others had been taken sick in exactly the same way and had gone on and died, and he was afraid that this one would do the same thing, or words to that effect, that this one would go the same way."

Dr. Herrington testified that at the time the respondent did not state what medicines he had been giving the patient. He testified that on the following Monday he met the respondent on the road, and the latter then told him that the boy was worse; that his mouth had become very sore, and the skin of the anus was irritated, and he seemed very much weaker. Dr. Herrington further testified: That on the following Sunday he was called, with Dr. Conboy, to see the patient. That Dr. Conboy came over and asked him to go down with him, stating that the patient was very much worse; and that they went, both of them, to see him. Upon their arrival at the Sparling home, the respondent and Dr. Holdship were there. That at that time witness did not examine the boy very closely, and it was evident that he was dying, and there was nothing to be gained by doing anything. That one couldn't get any symptoms out of the boy to amount to anything.

On the 7th of August Dr. Conboy of Bad Axe was called down by the respondent to see the patient. He arrived there about midnight and found the respondent sleeping in a hammock outside the house and accompanied him to the bedroom where the patient was. He testified that he looked over the boy, felt his pulse, and listened to the respondent's story, who told him that he was vomiting and purging and had abdominal pain. The respondent then told Dr. Conboy that he thought possibly the patient had pancreatitis, or inflammation of the pancreas, and told what he had

been giving him, mentioning bismuth and ipecac to try to stop the vomiting. The doctor observed that the patient was vomiting, and the respondent and patient's mother told him that the patient had excessive diarrhea and purging. The doctor testified that he then observed, with reference to the patient's condition from the examination, that he had severe abdominal pain, pain over the belly, and particularly over the stomach; that his mouth was inflamed, also the mucous membrane or lining of his mouth and tongue were inflamed. The patient's pulse was fast and feeble, being about 100, and that the respondent told him that he had no fever, or very little. The witness testified that he then observed that most of the vomiting came from too much medicine he had been getting, and said, "Let's stop all medicine and see what difference that will make," and said he would come the following day and see what difference that made; and he said he would give him some tonic out of his pocket, and left some pills to be given three times a day until he came back. The tablets consisted of strychnine, 1/100 of a grain. He examined him for different diseases prevalent there, that had similar symptoms, to see if it might be one of those; for instance, appendicitis. He concluded that there was no infectious disease, or none of the ordinary diseases. When the witness went away nothing was said; only he would be back the following day. He reached there about 5 o'clock p. m. the next day, and the respondent was there and the mother of the boy. He then examined the patient more carefully in the daylight. He found symptoms the same as the day preceding and learned that he had been purging and vomiting, had diarrhea and abdominal pain, and the mucous membrane of the throat and tongue was inflamed and sore, likewise the nostrils and eyes to some extent. The witness in examining the patient was standing at the head of the bed looking over his head

and face, and the respondent was at the witness' right, sitting about halfway down the bedside. The witness testified as follows:

· "I also examined the eyes a little after examining the mouth. I examined his mouth quite particularly for different kinds of poison in the gums and throat, because the gums very often tell what kind of poison is taken by an individual. I asked the boy if his eyes were sore, and the doctor answered up and said he had conjunctivitis; that is, inflammation of the eyes. Scyrel made a reply with reference to his eyes and answered in the affirmative that they had been sore. I asked him if his eyes were itchy, and he said yes, and then the doctor interrupted. He asked me what I was hunting for. I said, 'Oh, nothing.' The condition of his pulse was the same as the former condition, 100, fast and feeble. I started for the bedroom door to leave the room. I got as far as the door, a little outside of the door. The doctor followed and caught me by the shoulder or arm and twisted me around and spoke to me. *  *  *  I was walking out of the bedroom and got to the door, just out of the bedroom door into the sitting room, and the doctor followed me from the side, from where he was sitting halfway on the east side of the bed, followed me around the head of the bed out of the dining room and caught me by the right shoulder and twisted me around.

"*Q.* What did he say to you?

"*A.* Asked me if I was thinking of arsenic.

"*Q.* He asked you if you were thinking of arsenic?

"*A.* Yes.

"*Q.* Just use the language that he used, if you can recollect.

"*A.* 'Are you thinking of arsenic, doctor?'

"*Q.* Had you mentioned arsenic up to that time?

"*A.* No, sir.

"*Q.* What did you say?

"*A.* I said I was.

"*Q.* What did he say?

"*A.* Well, he said it was strange both of us would be thinking of the same thing at the same time. We both walked out doors away from the patient, and

then he volunteered the statement that he believed the others had died of the same thing.

"Q. What did he say, if anything, as to whom he meant by the others?

"A. The others of the family that died, seen by him I judged.

"Q. Any further conversation that you had with him, anything further that you recollect?

"A. On going in the house before the arsenic was spoke of, I think he predicted the death of Ray. Ray is another boy, a member of the family. I talked with Mrs. Sparling for a while in the presence of Dr. Mac-Gregor. I told her the boy was very sick with some poison in his system, and she thought a while and said that she agreed with me; she believed so, too. She said that he had been threshing, and he came home with dust and dirt in his nostrils, mouth, eyes, and lungs, and she wasn't surprised at all that his whole system was poisoned. I told the doctor I had better say something to Mrs. Sparling about it, and he said, 'All right.' It might not have been those words, 'All right.' * * * He might have said, 'Yes.' I went away shortly after this. I left Mac-Gregor there. I don't think there was anybody else there besides the doctor and Mrs. Sparling and possibly one or two others around the house; I don't think they were inside. * * * When I arrived the second time, that is on the 8th, the doctor told me that nothing had been given at all except my pills, my tablets, my medicine, except that he had given him an enema.

"Q. You didn't know what the condition was there?

"A. The doctor told me that he had tenesmus, that is, straining, and the bowel looked reddish and inflamed. I believed it, took his word for it, and didn't bother the boy. I next saw the patient on the 13th. When I left there on the 8th I came to Bad Axe and immediately hunted up Mr. Boomhower, the prosecuting attorney of the county. I had a conversation with Mr. Boomhower. As a result of that conversation I went to Ubly to Dr. MacGregor's house with Mr. Boomhower, the prosecuting attorney. * * * We talked the matter over considerably, and Mr. Boomhower said to MacGregor that he would have a

*post mortem* or an investigation. At one time he said *post mortem,* and at another time he said investiga- tion in case the boy died. Mr. Boomhower spoke of the insurance on one of the boys. I don't know which one it was now, and asked the doctor about some in- surance. I don't remember what the doctor said. Then the nurse question came up. We concluded to have a nurse; we thought it was better to have a nurse. The three of us all agreed to that, to keep the boy from getting more poison. Mr. Boomhower told the doctor to try and get a nurse as quick as possible and have the boy watched. The doctor went into the kitchen or dining room, his own living room, and told his wife. We could hear his wife talking with him. We heard his wife calling on the telephone to the Sparling house, and then down to Port Huron for a nurse. We heard Mrs. MacGregor telephoning for a nurse.

"*Q.* What, if anything, was said by Mr. Boom- hower or anybody as to Mrs. Sparling's giving this poison, or his suspicions relative to that?  *  *  *

"*A.* Well, we didn't speak very openly.  *  *  * I don't remember any exact language at all.  *  *  * We were careful what we said; we couldn't state openly there was poisoning committed by anybody, so there wasn't anything particular said.  *  *  * The substance of the conversation was that the boy was being poisoned and he needed watching; he needed to be watched."

After objection and some colloquy the witness pro- ceeded to state:

"The doctor appeared to leave the blame on Mrs. Sparling. That explains it as well as I can put it, I think. He didn't say anything outspokenly, didn't make any insinuations, only underhandedly, as I recollect.  *  *  * I had never heard anything from MacGregor on any of my visits of insurance be- fore that night. I saw Scyrel Sparling again the fol- lowing day. I went out there on my own motion and Mr. Boomhower's. Neither Dr. MacGregor nor Mrs. Sparling asked me to come out." (The term "under- handed" in the testimony of the witness, or "under- handedly," was stricken out; the court remarking: "The underhanded part of it may be stricken out.")

"On the 9th I arrived there about 7 o'clock in the evening. I found, when I got there, the nurse and Mrs. MacGregor, the doctor's wife. I stood at the door. The bed of the sick boy was moved out of the bedroom now and was facing right across the door. A little later, two or three minutes, possibly five, Dr. MacGregor came from the back part of the house. He came into the front room. I had never seen the nurse. After I got into the main room, and Mac-Gregor came in, he brought me into the vacated bedroom. The doctor closed the doors after we got in. He placed two chairs close together, pointed towards one for me to sit down in, which I did, and he sat in the other one. He put his left arm around my shoulder and leaned over and asked what I came down for. He said it must be for something important. I said, 'Oh, no.' Mr. Boomhower and I had talked it over, and we thought it was better for me to come down and talk to Mrs. Sparling, that we were afraid that he hadn't the heart to tell her that the boy was poisoned, and I thought it would be better to scare her well and good, so as to prevent her giving more poison in case she was doing so. He raised his right hand, and says, 'You don't have to.' He says, 'I have scared the devil out of her.' He said she was sick in bed; she was in collapse; she would be in an asylum within four months. I then asked if the boy was insured, and he said, 'Yes,' but he said the worst of it was his father had written him for about half of it, I think, or his father had written him up for half of it. We went out into the other room immediately after this conversation. When he put these chairs together and put his arm around me, his manner was confidential, and he talked in a low tone of voice. When I went out into the sitting room, I cannot remember now whether he beckoned to the nurse or called her in, but he had the nurse in the bedroom talking with her immediately after I vacated it. He closed the door. They remained in that bedroom, the nurse and MacGregor, oh, possibly five minutes or less, possibly less. I did not see Mrs. Sparling at all that day. I do not know whether Mac-Gregor came away from the house or not; I didn't see him at all."

The witness testified that he made a casual examination of the boy that day. His symptoms were substantially the same as the day preceding; it was proceeding a little better; he said he felt better, his pulse was 100, the same as before, fast and feeble; the eyes and throat were inflamed; yet the witness thought the eyes had cleaned up a little, not so bad as the preceding day. The patient said there was tingling in the hands and limbs. The witness proceeded:

"I saw the patient again on the following Sunday, the 13th. Dr. MacGregor called me out. He said to go with Dr. Herrington; that Dr. Herrington was called out there. I went with Dr. Herrington. When I got there, Dr. Holdship, the nurse, and Dr. MacGregor were there.

"Q. Did you have any talk with MacGregor just as they came up?

"A. Yes.

"Q. What did he say? Tell us that conversation.

"A. As Dr. Herrington and I walked up towards the house, Dr. Holdship came down to meet us. I shook hands with Dr. Holdship and passed him by up towards Dr. MacGregor, and Dr. Holdship passed me by and spoke to Dr. Herrington and shook hands with Dr. Herrington and remained talking with him, and I remained talking with Dr. MacGregor.

"Q. You remained talking with the defendant while Herrington and Holdship went along together?

"A. No, they were behind us, further from the house than we were.

"Q. What did Dr. MacGregor say to you?

"A. He asked me if Herrington knew anything about the poison, about the arsenic.

"Q. He asked you if Herrington knew anything about the arsenic?

"A. Yes.

"Q. Which was it, about the poison or about the arsenic.

"A. About arsenic.

"Q. What did you say?

"A. I looked around. I didn't want them to see me whispering with him; I spoke in a low tone though;

I said, 'He knows nothing about arsenic, about a poison only.'

"Q. To whom did you have reference when you said he knew nothing about arsenic, a poison only?

"A. Dr. Herrington.

"Q. What tone of voice did Dr. MacGregor, the defendant, use to you in asking you if Dr. Herrington knew anything about the arsenic?

"A. A low tone.

"Q. Well, how far was Dr. Herrington and Dr. Holdship away from you two?

"A. About 30 or 40 feet.

"Q. Any further conversation take place between you and MacGregor at that time?

"A. No. I walked up towards the house, didn't want to be seen talking or whispering with him about it. The other doctors came along, and we went into the house. I examined the pulse of the patient the first thing, and the other times. Every time I had been there, it was about 100; now it was about 120. That was Sunday afternoon about 4 or 5 o'clock. I concluded the patient was going to die; he was getting weaker; the pulse was getting weaker. He died some time the next day, the 14th. I didn't see him again before he died."

The doctor then proceeded to testify as to the symptoms of arsenical poisoning. He stated that they were vomiting and purging, pain across the belly, inflamed or congested or red mucous membrane, that is, the lining of the throat, mouth, and nostrils, of the eyes, of the intestines; that these were the most prominent ones; that the nerves are affected later on, become tingling and numb, finally paralyzed, particularly the leg muscles; that the pulse becomes weak, feeble, and slow, or rapid, weak, and fast; that the temperature varies very little; there is practically no fever. He was asked the question whether from his knowledge of the case, and from his expert knowledge in toxicology, he was able to state the cause of Scyrel Sparling's death. After objection by respondent's counsel and exception, the witness

answered that it was poisoning by arsenic, and he stated that all the symptoms he observed in the patient were consistent with arsenical poisoning. The witness testified that on the 15th, the day following Scyrel's death, he had a conversation with the respondent at Bad Axe in regard to the liver and portions of the body that respondent had brought up and had with him. The witness testified that he had the liver in a crock; then he had in a sealer, small portions of the pancreas, spleen, lung, and liver. These were shown to Dr. Herrington, "and I think were closed up and put away until a day or two after, when the coroner, Dr. Morden, came and took them."

The respondent said that Dr. Holdship, who had assisted him in the *post mortem*, said he thought that cancer of the liver was the trouble with the boy. That in answer to an inquiry from the witness the respondent stated that the stomach and intestines were all right. He asked the respondent if they were inflamed, and he said, no, they were not; that they were normal. He further testified that he asked the respondent if he had examined them, and he said they had been examined and they were all right. The witness further testified that it was not possible to ascertain whether the stomach was inflamed by looking at the outside of it; that the inflammation of the stomach would be in the lining on the inside; and that in order to tell whether the stomach was free from inflammation it would be necessary to cut it open and examine it, and that you could not tell by taking it in your hand and raising it out of the body three inches; you could not tell anything about whether the stomach was all right by looking at it in that way; that stomachs from arsenical poisoning would be inflamed inside the lining; and that there would be no inflammation outside from arsenic; that in cases of arsenical poisoning the alimentary tract is red, congested, and inflamed; and that these would in-

clude the stomach and intestines on the interior, and in order to find out whether the intestines were inflamed on the inside it would be necessary to cut them open likewise for examination. The witness did not think it would be possible to raise them up and look at them by a smoky oil lamp in the nighttime and tell about them. The witness testified that he saw the respondent almost every day after that for some days, and he came to his office at Bad Axe.

"*Q.* Was there anything said by any of you during any of these visits about hypertrophic cirrhosis of the liver?

"*A.* Yes.

"*Q.* Tell us about that. How did that come up?

"*A.* I saw the liver, saw it was enlarged, and said it was possible. I looked up and found a book where it seemed to accord with a disease called hypertrophic cirrhosis, in regard to the size, and I told him it might possibly be hypertrophic cirrhosis. His statement that the stomach and intestines were normal certainly had an influence upon my making that statement to him. I thought it might possibly be something besides arsenic that did it, because he said the stomach and intestines were normal. If arsenic were taken into the system and one died from arsenical poisoning, the interior lining of the stomach and intestines as a matter of fact would not be normal; they would be congested and red."

The *post mortem* of Scyrel was held the night that he died by respondent and Dr. Holdship; Drs. Herrington and Conboy being unable to attend at that time. Instead of waiting until the next morning, as the people urge should have been done, they proceeded alone. During the time that respondent and Dr. Holdship were holding the *post mortem* on the body of Scyrel, and after the liver, spleen, and pancreas had been taken out, Dr. Holdship picked up the stomach. Respondent said: "Are you going to take that out? It looks all right to me, doesn't it to you?"

178 MICH.—29.

To which Dr. Holdship replied, "Yes, it looks all right to me." The respondent then raised up a piece of the bowel, and said, "Don't that look good to you?" To which Dr. Holdship responded, "Yes, it looks all right," and no parts of the intestines or stomach were taken out, neither was the stomach opened up. It was then declared by the respondent that the cause of Scyrel's death was cancer of the liver.

There was testimony showing that the respondent told Dr. Conboy and Dr. Herrington, after the *post mortem* was held, that the stomach was opened and was perfectly normal; that respondent also told the coroner, Dr. Morden, at the Sparling home, on August 16th that Scyrel's stomach had been opened and that it was perfectly normal; that it was not congested or inflamed. Upon the trial respondent denied telling either Drs. Conboy, Morden, or Herrington that the stomach was opened.

There was testimony showing that in a conversation with Thomas Phillips, five days after the death of Scyrel, respondent said, "I am going to tell you something that nobody else on earth knows except the family," and that he then told Phillips that all four members of the Sparling family died of syphilis. Phillips then said, "Doctor, what about the poison that is being talked about?" Respondent then said:

"There will be poison found in all four of the bodies. It is poison that was taken in medicine for this disease that they were suffering from," and that the poison was arsenic.

A short time after the death of Scyrel, a portion of his liver and some of the other organs were examined by Dr. Warthin, who was at the head of the pathological department of the University of Michigan. At the time of removing the pancreas at the *post mortem* held by the respondent, a small portion of the duodenum was removed with the pancreas. Dr.

Warthin made a pathological examination of the liver, pancreas, lung, and spleen, and, summing up the entire changes in the liver, pancreas, and spleen, he testified that the conditions would indicate poisoning by one of the metals, and would point especially to poisoning by arsenic. He also testified that a lethal dose of arsenic might be entirely eliminated before death; and he testified in answer to a hypothetical question, over the objection and exception of respondent's counsel, that in his opinion Scyrel died of arsenic poisoning.

Dr. Vaughn, of the University of Michigan, and his assistant, Dr. Pryor, who made a chemical examination of the liver and other organs of Scyrel's body, testified that they found arsenic in the liver in unweighable quantities; and in answer to a similar question as that put to Dr. Warthin made a similar answer. The two medical witnesses testified as to the symptoms of arsenical poisoning. Dr. Vaughn testified, in substance: That in acute arsenical poisoning the symptoms generally came on within a few hours after the arsenic is taken; that there is more or less burning pain in the stomach, nausea, and vomiting; that this is generally followed by purging; that there is a sensation of depression and anxiety, weakness of the heart; the heart becoming rapid and weak; that these symptoms generally continue, and in acute arsenical poisoning death, if death results at all, is likely to result within 24 hours; that in the case of sub-acute poisoning the symptoms do not come on quite so promptly; that they are less marked, although they are of the same kind. That—

"They continue for days, for two or three days. Then the patient is apparently better, still remaining, however, with a weak heart, and more or less burning pain in the stomach, sometimes in the gullet and intestines, and pains in various parts of the body; marked thirst, the lips may be parched—excoriated."

The patient finally may die after seven or eight days, largely with symptoms of exhaustion and failure of the heart. The doctor then described that in chronic poisoning, due to small quantities of arsenic and frequent, certain nervous symptoms are developed; neuritis, which means inflammation in the nerves, the arms especially becoming very sore and painful on pressure, and even without pressure, certain skin eruptions, and arsenical eczema, inflammation, and irritation of the eyes, nose, throat, and this condition may continue for weeks, and in fact for months, may be a chronic condition which lasts for a long while. The following occurred in his testimony:

"*Q.* In what condition would you expect to find the stomach and intestines of a party who had been suffering from arsenical poisoning for a period of ten days?

"*A.* I should expect the mucous membrane of the stomach and intestines to be inflamed, more or less reddened and in a catarrhal condition.

"*Q.* Could you tell the condition simply by looking at the outside of the stomach and intestines?

"*A.* You could not by looking at the outside; you would have to look at the inside.

"*Q.* In order to look at the inside, you would have to cut the stomach open?

"*A.* You would.

"*Q.* How do you account for the great thirst in cases of arsenical poisoning where there is no fever and a suppression of the urine?

"*A.* The thirst is due to the irritation of the arsenic on the mucous membrane of the alimentary canal. It becomes highly inflamed locally. It is hot, and you want water and plenty of it, cold water. No fever, but a local irritation of the mucous membrane of the alimentary canal."

The respondent sent to his brother a portion of Scyrel's liver, and testified that he got from his brother information that there was a toxic change in the liver; that that would be poison, but not necessarily a chemical poisoning; that it would be a poison

of some kind; that he got word from his brother that the liver showed a condition as though there had been poison there.

In the case of Albert, it appeared that Albert drove down to Ubly, and there was testimony that he was at the Courtland home at noon on the 29th day of April, 1911; that he was sick on that day and lay on a lounge and vomited. The respondent in his testimony claimed that he did not see Albert until the 30th day of April; but in his statement to the Gleaners Insurance Company, made on the 13th day of May, 1911, ten days after Albert's death, he stated that he saw him on April 29th and also on April 30th. On Sunday, April 30th, Albert and his mother went to church at Ubly and stayed for dinner at the respondent's home. Albert was then sick and lay upon the lounge there. The same afternoon, about 4 o'clock, respondent was at the Sparling home to see Albert, and from that time on Albert grew violently worse, and died early on the morning of May 3d.

On May 2d Dr. Conboy was called by the respondent to see Albert in consultation. He and the respondent drove together to the Sparling home, a distance of 4½ miles. On the way to the Sparling home respondent explained Albert's case and told Dr. Conboy about the boy falling from a tree and striking on his stomach. He also told Dr. Conboy that he had discovered the cause of the boy's sickness and weakness since the death of Peter; that the children were all weakened by the excessive sexual indulgence of the parents, which weakened the progeny. He there stated a number of symptoms to the witness, and said that they were vomiting, purging, soreness of the abdomen and stomach, no fever, and a rapid pulse.

The respondent stated that Albert had been sick only a day or two. They arrived at the Sparling home about 5 o'clock in the afternoon and found Mrs. Sparling alone with Albert. An examination of the

boy's condition was made. The patient was then very weak, his pulse was weak and rapid, and the heart weak; likewise the stomach was sore; not only the stomach, but the lower part of the abdomen, was likewise sore. His temperature was normal. The extremities—the legs and arms—were somewhat numb, the patient said. Dr. Conboy testified that he did not examine the patient's mouth and nasal passages very closely, but he remembered that they were somewhat red. The respondent again spoke about the boy falling from the tree, and said that he had found albumen in the urine. Dr. Conboy told the respondent that the boy had not any nephritis or albuminuria. Dr. Conboy testified that the respondent and he talked the case over together in the bedroom, and respondent said that he thought the boy was going to die. After Dr. Conboy agreed with this statement and said he thought the boy would die, respondent said it would be better to tell the mother then. Respondent said he had not the heart to do it, being a friend of the family, and wanted Dr. Conboy to go and tell the mother that Albert was going to die, and suggested that he tell her that the boy's weak, nervous condition could not stand the disease, and that he was going to succumb to the trouble on account of his weak, nervous system, as Peter did. Dr. Conboy went into the kitchen, where the mother was, and told her the story, and respondent followed him. When Dr. Conboy told the mother that Albert was going to die he thought, she fell over against the wall, sliding down, and respondent caught her and sat her in a chair. Soon after Dr. Conboy went back into the bedroom to look again at the patient. He found him at that time without pulse, and he seemed to be in collapse. He hurried out to the kitchen and told the mother and respondent that Albert was dying then. A hypodermic of strychnine and digitalin were injected into his arm to regulate his heart. He seemed

to revive. During the injection of the heart stimulant into his arm, the respondent asked Dr. Conboy what he gave him. He told him strychnine and digitalin, and he asked if he had any more strychnine, and Dr. Conboy gave him six or eight hypodermic tablets of strychnine. Dr. Conboy soon after left, leaving the respondent at the house. The next morning Dr. Conboy was informed that the boy had died before daylight that morning. Dr. Conboy testified that arsenical poisoning did not come into his mind at all while he was at Albert's bedside, but that, after the boy was dead and buried probably two or three weeks, he commenced to think upon that subject; that the first person that he ever suggested the subject to that he had thought of arsenical poisoning in connection with Albert's death was the respondent, while Scyrel was sick.

Dr. Corcoran, a physician living at Ubly, was also called to see Albert on the 2d of May, about 10 o'clock at night. He testified that the patient was then so desperately sick that he was in fact dying at the time; that his pulse was not discernible, and he had no temperature. In fact, he was slightly below normal, his abdomen was slightly distended and tender; he seemed sick to his stomach and made an effort to vomit, and was not able to talk. His arms and legs were cold and had very little sensibility. There was a suppression of the urine, and had been for 24 hours or more, or very near complete suppression of the urine. Taking into consideration the condition which was described to him by the respondent, Dr. Corcoran thought the patient was suffering from uræmic poisoning. He saw the respondent the following morning at his office and had a conversation in regard to signing the death certificate.

Respondent swore positively upon this trial that he never thought of poison at the time Albert was sick. At the inquest this question was asked him:

"*Q.* From the symptoms Albert had at the time (having reference to the time of his death) did you suspicion poisoning?

"*A.* I do not know whether I did or not; I was all shot to pieces. I don't think I said anything about poisoning to Dr. Conboy at that time."

In the case of Albert the respondent gave a certificate of death representing the cause of death to be acute Bright's disease. There was evidence tending to show that respondent tried to obtain a *post mortem* examination of Albert's body at the time of his death, but was unable to get the consent of the family.

Some time after the inquest over the body of Scyrel, the body of Albert Sparling was exhumed and a *post mortem* examination had, and the organs were sent to Ann Arbor. Dr. Warthin also examined the organs of Albert and found substantially the same condition as in the case of Scyrel, save that in the liver of Albert, Dr. Vaughn, who made a chemical examination, testified, that they found a sufficient quantity to weigh. Similar questions were put to both Dr. Vaughn and Dr. Warthin as to the cause of Albert's death, and their answers were substantially the same as in the case of Scyrel.

In July, 1909, all the boys, Peter, Albert, Scyrel, and Ray were insured in the Sun Life Insurance Company for policies of $1,000 each, and three of them, Albert, Scyrel, and Ray were insured in the Gleaners in January, 1910. The respondent examined all of the Sparling boys for insurance. The Sun Life Insurance Company was the company that respondent's father was the agent of, and respondent was the local examining physician. When the boys were discussing the subject of life insurance, they talked with the respondent upon the subject, and he told them of the Sun Life, and it was stated that the rates were lower in that company, and that this led to the taking out of these policies in the Sun Life. At the time of

Peter's death, all of the policies were made payable to the estates of the assured. This necessitated probate proceedings. Soon after that, and before Albert's death, the policies were changed, and the mother was, by proper designation, made the beneficiary in all the policies. Respondent wrote to his father in Canada and got some blanks and filled them out and had the three boys sign them so that Mrs. Sparling could get the money without going into the probate court. After Albert's death, there seemed to be some question about whether the policy would be paid without administration, and respondent had some talk with the prosecuting attorney upon the subject, but thinks he did not state anything about the special designations or assignments; but after the proceedings started in the probate court the insurance money came under the designation or assignment, and a draft for $1,000 from the Sun Life Insurance Company came directly to the respondent, but the draft was payable to Mrs. Sparling. She indorsed this draft on the 7th of June, 1911, in the evening, and delivered it to respondent, and he went to Bad Axe to the State Bank of Frank W. Hubbard & Co., and turned in said draft, taking two certificates of deposit for the same—one for $684 and one for $316. Respondent then went to a motor sales company in Bad Axe, and with the $684 certificate of deposit paid for and obtained possession of an automobile that he had been negotiating for. On the next day he returned to Bad Axe and got the cash on the $316 certificate, except the sum of $17, which was kept out for Mr. Woodworth on a collection.

There is some question about the actual amount of indebtedness of Mrs. Sparling to the respondent at this time, but, according to respondent's own testimony, Mrs. Sparling was not owing that amount at the time he received the $1,000 and purchased his automobile. He was indebted to her at the time for

rent of the premises occupied by him as a dwelling in Ubly, which she had purchased under contract. On July 10, 1911, respondent left Ubly with his family for Canada with his automobile and made a tour of the Eastern States. On the day that he left Ubly, Mrs. Sparling handed him $20 more. The respondent was gone from home on this trip 20 days, returning to Ubly on July 30th. Respondent testified that Mrs. Sparling sent him $100, consisting of two $50 bills, while he was on his trip in Canada, in an unregistered letter which was sent in care of his brother.

The evidence tends to show very strongly that, after the death of John W. Sparling, the respondent became the adviser and confidant of Mrs. Sparling and the family. His visits at the Sparling home were very frequent, and his relations with Mrs. Sparling were such that he seemed to have gained her entire confidence. The evidence shows many expressions upon her part of his kindness to herself and the family; and, without going into details upon this subject, the evidence is undisputed that he had gained the entire confidence of Mrs. Sparling, and by his assistance, in all her business matters, she was largely dominated by him. It is the claim of the people, that she was to such an extent under his control as naturally would lead him to believe that he would be benefited by any moneys which she might receive. The evidence certainly shows that Mrs. Sparling was guided very largely by the advice of the respondent. He at times seemed to take an interest in and look after the work on the Sparling farm. He assisted the boys in butchering animals; he assisted in obtaining the insurance in the cases of Peter and Albert.

After Scyrel's death, the evidence tends to show that the respondent had to do with the effort to obtain money on Scyrel's policy. Ray Sparling testified upon that subject as follows:

"After Scyrel's death, we got the Sun Life papers. I think we got the policy from the bank at Ubly. We went there for some papers anyway, and took them up to Dr. MacGregor. I don't know exactly; I know we were there and got something signed. I don't know as I had much to do with signing them. I was working on the house and went down with Ma and got the papers and took them up to the doctor. She attended to getting them fixed up. I didn't have very much to do with it. Ma and Dr. MacGregor were doing some work on them; I didn't see them all the time."

There are many other circumstances that we shall not try to detail here.

Upon the trial of the case there was a challenge to the array of the jurors. The court overruled the challenge, which ruling was excepted to, and the subject will be referred to later.

Upon the trial of the case, and after the medical and other testimony had in the main been introduced relating to the death of Scyrel, the people offered evidence, to which we have alluded, relating to the death of Albert. This was objected to for many reasons, the objection overruled, and exception taken. The court announced that it received such testimony in evidence upon the theory of motive, intent, identity, and absence of mistake. During the progress of the case before the jury the following occurred: Mrs. Sparling, who was, as shown by the record, under arrest upon the same charge as that against the respondent, was brought into the courtroom, whereupon the court said in the presence of the jury:

"Mr. Peter Sparling, you may stand up. You are one of the sureties upon the bond of Mrs. Sparling for her appearance in this court.

"*Peter Sparling* (who was in the audience): Yes.

"*The Court:* Do I understand that you wish to be released from that bond?

"*Mr. Sparling:* Yes.

"*The Court:* Do you also speak for the other surety?

"*Mr. Sparling:* Yes.

"*The Court:* Mr. Woodworth is attorney for Mrs. Sparling and is present with other bonds.

"*Mr. Woodworth:* Yes. (Thereupon Mr. Woodworth produced a new bond, and Mrs. Sparling and the sureties signed the bond, and the court took this other bond, and the sureties were sworn in open court in the presence of the jury.)

"*Mr. Walsh:* I take exception to this in the presence of the jury."

The respondent has brought the case here upon writ of error, and there are 132 assignments of error. These have been grouped by counsel, and we shall consider such of the questions raised and discussed as in our opinion require attention.

1. The first assignment of error relates to the examination of the juror Avery on his *voir dire,* in which he expressed the opinion that respondent was guilty, in answer to a question by the prosecuting attorney. The immediate question asked was as follows:

"*Q.* I understand you to say, Mr. Avery, that from what you have read the defendant might be innocent or might not be innocent, is that the idea, he might be guilty or he might be innocent? (No response.)

"*Q.* Or do you think he is guilty or innocent?

"*A.* Why, I think he is guilty in my own mind.

"*The Court:* The juror may be excused.

"*Prosecuting Attorney:* Of course, I didn't mean to ask the direct question.

"*Respondent's Counsel:* The question was asked directly and the answer directly drawn by that question.

"*The Court:* It isn't susceptible of that construction at all.

"*Respondent's Counsel:* We take exception to the question and answer."

It is shown by the record that no juror who sat upon the trial of the case, with the exception of juror

Henry Binder, had been drawn at the time juror Avery was examined and stated his belief as to the respondent's guilt, and none of the jurors, with the exception of juror Binder, heard Avery make such statement, or knew that such statement was made. Juror Binder was expressly interrogated in detail upon the subject of any bias, prejudice, feeling, or opinion that he might have by reason of the answer of juror Avery, and he replied that such statement would have absolutely no effect upon him, and did not cause him to have or form any opinion whatever upon the guilt or innocence of the respondent. It also appeared that respondent exercised but 12 of his 30 peremptory challenges. It is the claim of respondent that the juror Avery had stated that he had an opinion, but that the prosecuting attorney was not satisfied with that answer, but kept on until he got the juror to state he believed the respondent guilty. The question asked would properly have been answered by yes or no, and we do not think, under the circumstances disclosed, that the respondent was prejudiced by the occurrence.

2. Second, third and fourth assignments of error. These all relate to the court's refusal to sustain the respondent's challenge to the array of jurors. Respondent claims that the challenge to the array was, by the court, found to be well founded, but that it refused to discharge the jury; that it appeared that in seven townships the number of jurors returned was short of the number required; that in fourteen townships the number of jurors returned was in excess of the number required; that in two townships the return was not signed by any one; that in Harbor Beach City there were twelve jurors returned, and the return was only signed by one person; that in one township no jurors were returned at all; and that in only six townships was the statute followed.

The record discloses the following action by the trial court was had:

"*The Court:* I think a general order will be made overruling the challenge to the array; but the court holds that jurors from towns from which short lists are returned are disqualified, and may be challenged for cause; and correcting the lists from the townships in which there is an excess, by striking off the excessive names from the bottom of the lists, and any jurors who are subject to be stricken that way are disqualified, and subject to challenge for cause."

In reply to counsel for respondent, the court further said:

"I will accept your lists there as to the excess, for the purpose of striking off. As to the other townships, I find a shortage as you set forth. * * *

"*Respondent's Counsel:* What does the court find in regard to Port Austin township? The list is not signed by any one.

"*The Court:* I will hold that that is ground for challenge for cause from that township, Port Austin, although, if that ground had been stated on Saturday, I would have had a new list returned from that township.

"*Respondent's Counsel:* Well, we just made the general statement that some of them were not signed, without mentioning the names; I didn't look it up. There are also two townships, one signed by the clerk alone, and the other by the supervisor.

"*The Court:* I will say further that I propose, if challenges are used, to fill the panel. I have ordered new lists from the short townships, and, if these jurors from the short townships and the excess townships are excluded, I do not propose to fill the panel until the new drawing is made from the regular lists, including the lists supplying the place of these short lists from those townships. * * * I will call no more jurors to the box until we have the new drawing from the jury lists, including the new lists from the short townships.

"*Respondent's Counsel:* Of course, the court understands our position. We maintain that this challenge to the array, that the whole list as drawn, hav-

ing no foundation under it, should be quashed, as though never drawn, and that a new drawing should take place. * * * We take an exception to any other course. * * * We offer in evidence the jury list from the city of Harbor Beach, purporting to be signed by the city clerk, Thomas T. Bliss.

"*The Court:* The list from Harbor Beach may be treated as insufficient, and the clerk hereby instructed to get it properly certified for the purpose of the new drawing. The jurors on that list will be subject to challenge for cause, at this time."

Thereupon, the jurors who had been theretofore summoned were allowed to remain as a part of the jury, and four of them finally sat upon the case. Additional talesmen were ordered, and these were obtained by new returns being made from several of the townships, namely, those where too few jurors had been returned theretofore, and where the lists had not been properly signed, and these, together with the old lists, constituted the list of jurors from which the additional talesmen were drawn. The jury, as finally completed, consisted of some jurors who had been drawn prior to the challenge to the array, and some drawn subsequent thereto.

Our statute relating to the return of jurors (section 342, 1 Comp. Laws; 5 How. Stat. [2d Ed.] § 12900) is as follows:

"In case the officers whose duty it is under this act to make and return lists of petit jurors, fail to meet, make or return said lists at the time and in the manner prescribed by this act; or in case said lists shall become exhausted; or in case said lists shall for any reason be declared illegal before the year for which they were made shall have expired, it shall be lawful for the circuit judge of any circuit court in this State to direct said officers to forthwith meet, make and return to the county clerk new lists of jurors for the remainder of the year, from which lists so made and returned jurors shall be drawn for the balance of the year. And whenever, for any cause, grand or petit jurors shall not have been drawn

and summoned to attend any circuit court, or a sufficient number of qualified jurors shall fail to appear, such court may, in its discretion, order a sufficient number of grand or petit jurors, or both, to be forthwith drawn and summoned to attend said court: Provided, that in drawing jurors under this section the court may, for the purpose of obtaining a jury or talesmen near the county seat, direct from which township or supervisor districts such jurors shall be drawn."

Under this section it has been held that the circuit judge, if he deems the lists already made to be invalid, has authority to declare them so, upon his own motion, and order new lists returned. *Smaltz* v. *Boyce,* 109 Mich. 382 (69 N. W. 21). In *People* v. *Coffman,* 59 Mich. 1 (26 N. W. 207), it was held that a challenge to the array was properly overruled, which was based on the failure of a township to return a list of jurors. There a conviction was sustained where the jury was drawn from six of the eight townships in the county; two townships having returned no lists at the time of the trial. In *Hewitt* v. *Saginaw Circuit Judge,* 71 Mich. 287 (39 N. W. 56), it was held that the return of an excessive number of petit jurors was good cause for a challenge to the array, but in such a case that it was the duty of the court to direct the clerk to strike from the excessive lists all names listed below the requisite number first appearing.

We are of the opinion that the action of the trial judge in holding that the short lists of jurors were defective, and ground of challenge for cause, was correct. The excessive lists were properly corrected by striking off the names below the requisite number; and the omission of a township to return any list was not, in our opinion, ground for challenge to the array. The course pursued by the trial judge gave a complete list of jurors from all of the townships and cities of the county, properly returned, so that a jury might

be obtained from the whole county. We find no error in the ruling of the court in the matter of impaneling the jury.

3. The twenty-eighth, twenty-ninth, thirty-second, fortieth, and forty-third assignments of error complain of the trial court's action in admitting testimony as to Albert's death and its cause, over the objection and exception of respondent. Testimony was admitted tending to show that, after the coroner's inquest upon the body of Scyrel, Albert's body was exhumed and some of the viscera sent to Ann Arbor for examination. Dr. Vaughn testified that he found, by making the Marsh test, that arsenic was present in weighable quantities in the liver. Dr. Warthin testified that Albert's liver was substantially in the same condition as Scyrel's, and both gave their opinion that Albert died of arsenical poisoning. Was this evidence admissible? The respondent contends that it was not.

This subject is not a new one in this State. In *People* v. *Seaman,* 107 Mich. 348 (65 N. W. 203, 61 Am. St. Rep. 326), the English and American authorities are reviewed at length, and this court said:

"Upon principle and authority, it is clear that where a felonious intent is an essential ingredient of the crime charged, and the act done is claimed to have been innocently or accidentally done, or by mistake, or when the result is claimed to have followed an act lawfully done for a legitimate purpose, or where there is room for such an inference, it is proper to characterize the act by proof of other like acts producing the same result, as tending to show guilty knowledge, and the intent or purpose with which the particular act was done, and to rebut the presumption that might otherwise obtain."

Then followed *People* v. *Thacker,* 108 Mich. 652 (66 N. W. 562). In that case the respondent was on trial for the murder of his wife by poisoning, and the

178 MICH.—30.

prosecution was permitted to introduce testimony tending to show that, at the same time he was claimed to have been poisoning his wife, he was also administering poison to her sister, who was an inmate of his household. It was held that, if there was evidence in the case that the respondent had administered poison to his wife, said testimony was competent as bearing upon his motive or intent in doing so, but that it was error to instruct the jury that they might consider said testimony for the purpose of establishing whether the respondent in fact administered poison to his wife, as charged.

*People* v. *Lonsdale,* 122 Mich. 388 (81 N. W. 277). In that case upon a prosecution for manslaughter, where the evidence was conclusive that a criminal abortion was procured, and the issue was whether or not the respondent procured the abortion, the guilty knowledge or intent of the person committing the crime being deducible from the crime itself, it was held that testimony as to what respondent did when applied to upon a certain occasion to produce an abortion upon a witness, offered for the alleged purpose of showing the intent, was irrelevant, and its admission reversible error.

In *People* v. *Gorsline,* 132 Mich. 549 (94 N. W. 16), in a prosecution for bribing a village clerk to issue false sparrow certificates, testimony of prior similar transactions, coupled with evidence tending to show a conspiracy with another to continue them, was admissible for the purpose of characterizing and making clear the purpose of respondent in the payment of money upon which the prosecution was based.

In *People* v. *Hoffmann,* 142 Mich. 531 (105 N. W. 838), on the issue of the fraudulent intent of a coroner in falsely certifying on a voucher that a deceased person over whose body he had held an inquest, was a "stranger," vouchers in some 40 similar cases, with evidence to the effect that in many of them the de-

ceased had been a long-time resident of the city, that inquests in many cases were not, in fact, held, and that autopsies and other services charged for were not rendered, were held admissible.

In *People* v. *Collins*, 144 Mich. 121 (107 N. W. 1114), on a trial for murder by poisoning of one Leachman with arsenic, it was held to be prejudicial error to admit evidence to show the presence of arsenic in the body of another member of respondent's household who died some months before the person alleged to have been murdered; it being expressly disclaimed that there was a common scheme or plan embracing the killing of both persons, and the jury being instructed that the only purpose of the evidence was to show the presence of arsenic in the house. In that case Justice OSTRANDER, who wrote the prevailing opinion, said:

"The presence of arsenic in the remains of Wright had no legitimate tendency to prove that respondent had arsenic in her possession during the illness of Leachman. Undoubtedly, the giving of a wrong reason for admitting testimony is not prejudicial error, if the testimony is for any reason admissible and the jury is properly instructed concerning the use to be made of it. It is claimed here that this evidence was admissible to prove (1) intent; (2) absence of mistake or accident; and (3) identity of the person charged. If it was, for any of these purposes, admissible—questions which we do not consider—the error committed was not, for that reason, cured, and was clearly prejudicial."

It was further said that as the record did not contain all of the evidence, and owing to the singular circumstances of the case, it was not deemed wise to attempt to lay down any controlling rules respecting the use, if any, to be made of such testimony, upon a new trial.

In *People* v. *Minney*, 155 Mich. 534 (119 N. W. 918), on the trial of a person accused of the crime

of mutilating a horse by cutting out its tongue, it was held that proof of the act was sufficient to establish the malicious intent, if done by a sane person; and that evidence that respondent had been guilty of other acts of a similar nature was incompetent. In this case the evidence of other acts had no relation to the offense charged.

In *People* v. *Giddings*, 159 Mich. 523 (124 N. W. 546, 18 Am. & Eng. Ann. Cas. 844), where a respondent was charged with furnishing intoxicating liquors to one of a number of berry pickers in violation of the local option law, evidence of similar offenses relating to other berry pickers at about the same time was held competent to show intent, and to rebut any inference of mistake or accident.

In other jurisdictions the authorities are so numerous, upon this subject, that to discuss them would render this opinion too voluminous. We shall refer to some of them, however.

The following language is used by counsel for respondent:

"In the case at bar, the prosecuting attorney had introduced in evidence a sworn statement of Dr. MacGregor, given at the coroner's inquest, to the effect that he had not given the deceased any arsenic. Accordingly, there is no ground for urging that this testimony was admissible to show that arsenic was not given by Dr. MacGregor through mistake or accident. There was no ground for allowing its introduction on account of showing intent or motive because, from the giving of poison, the intent to kill is presumed and the acts itself establishes the intent. It would be the merest subterfuge to attempt to say that this testimony was introduced for either of these purposes."

This is strong language, but we think it cannot be seriously urged that, because of the respondent's statement referred to, the people were precluded from showing either actual intent or malice; nor do

we think that the respondent would have been precluded from showing either accident or mistake.

Prof. Wigmore, in his work on Evidence, says (vol. 1, § 363) in cases of homicide:

"The *intent* principle receives constant application; for the intent to kill is in homicide practically always in issue, and is to be proved by the prosecution, and the recurrence of other acts of the sort tends to negative inadvertence, defensive purpose, or any other form of innocent intent. For this purpose, therefore, the evidence is receivable irrespective of whether the act charged is itself conceded or not. Where (as usually) it is not conceded, the evidence of intent goes to the jury to be used by them only on the assumption that they find the act to have been done by the accused; it is then to be employed by them in determining the intent. This use of such evidence is universally recognized. As to the similarity of the other acts, no fixed rule can be formulated. They certainly need not have been done to the same person; they need not to have accompanied more or less immediately the act charged, and they may have been done even at a subsequent time. The precedents show every variety of circumstances, and a correct application of the principle would receive any evidence of the sort which conveys any real probative indication of the defendant's intent. * * * Other instances of death by poison under somewhat similar circumstances serve to negative the supposition of inadvertent taking or of mistaken administration, even though the person responsible for the other poisonings is not identified; and thus, a criminal intent having been shown for the act charged, by whomsoever done, the defendant may be then shown to be its doer. * * *

"The principle of *design* or *system* finds here frequent application. It supposes that a design or plan in the defendant is to be shown, as making it probable that the defendant carried out the design or plan and committed the act; and it receives former similar acts so far as through common features they naturally indicate the existence of such a plan, design, or system, of which they are the partial fulfillment or

means." See note 10 to this section, which contains the English and American cases.

In the recent well-known case of *State* v. *Hyde*, 234 Mo. 200, at page 232 (136 S. W. 316, Ann. Cas. 1912D, 191), the supreme court of Missouri discusses the very question raised by respondent's counsel in the instant case, as follows:

"The defendant now contends that there is no question of intent in the case. His counsel now concede that if the defendant gave Col. Swope a deadly dose of poison, the criminal intent may be inferred from the act. The defense denied the act. It is true that the evidence in the record raises no question of intent. It may also be conceded that if the defendant knowingly administered deadly poison, the intent may be inferred from the act, and no further proof is required. But it must be remembered that in a criminal case the defendant files no written pleading setting up his grounds of defense. His plea of not guilty puts in issue every element of the charge, including intent. It would have been consistent with his plea had the defendant claimed in his defense that there was accident or mistake, both of which are involved in intent, in the giving of the alleged poisoned capsule to Col. Swope. It is a part of the State's case to show criminal intent, and in doing so to negative accident or mistake, by any proof competent for that purpose. The State was not required to rest upon the assumption that the proof would show that the intent accompanied the act, nor to hold back, for rebuttal, evidence showing intent. The State could not anticipate the theory of the defense.

"In the case of *Trogdon* v. *Commonwealth*, 31 Grat. (Va.) 862, quoted with approval in *State* v. *Myers*, 82 Mo. 569 (52 Am. Rep. 389), in answer to the suggestion of counsel for the prisoner that the jury would infer the intent from the act, and therefore evidence of collateral facts was unnecessary and improper, the court said: 'It is impossible for the court to foresee what may be developed in the progress of the trial. When evidence is offered of other transactions of the accused to show the guilty intent, is the court to say the intent is already conclusively proved,

and the evidence is therefore irrelevant? What would be thought of a judge who would thus prejudge the case, and invade the province of the jury?' This court further in the above *Myers Case* said: 'It has been held by the highest authority in this class of cases (fraudulent trick), that even the admission of the accused that the act was done with criminal intent cannot preclude the State from proving it by any other competent testimony, for the jury are the sole judges of the evidence.' We, therefore, hold that it was competent for the State to introduce evidence on the question of intent in its case in chief.

"As tending to prove the absence of mistake or accident, it is competent to prove that on other occasions the defendant used the same means, with the same effect. An accident or mistake may occur, but every time such act is repeated the likelihood of accident or mistake diminishes. A doctor may give a poisoned capsule once to a patient by mistake, but such mistake is not likely to happen twice, still less three times. But the evidence of the other acts relied upon must show them to be identical with the act in question, otherwise they have no probative value so far as this question of mistake or accident is concerned."

In the case of *Goersen* v. *Commonwealth*, 99 Pa. 388, the defendant was on trial for poisoning his wife. The State proved that an autopsy performed upon the body of his mother-in-law, who had died about two weeks earlier, revealed in her stomach a deadly dose of the same poison which was found in the stomach of the wife. Experts testified that they both died from the effects of the same kind of poison, which was found in a deadly quantity in the stomach of each. There was also evidence that the defendant, a physician, had attended upon both. The evidence of the death of the mother-in-law by poison was admitted on various grounds. In that case, as here, the autopsy showed that the poisons were identical in character, and without question produced death in each case. In that case it was held that evidence of

another offense might be given to establish identity;
to show the act charged was intentional and wilful,
not accidental; to prove motive; to show guilty knowl-
edge and purpose and to rebut any inference of mis-
take; and to connect the other offense with the one
charged as part of the same transaction.

While failure to show motive would not be suffi-
cient to acquit, yet, where a respondent denies the act,
the question of motive becomes important, and pres-
ence of motive tends towards guilt.

In *Commonwealth* v. *Robinson*, 146 Mass. 571 (16
N. E. 452), it was held that it was for the presiding
judge, at the trial, to decide, in the first instance,
whether there was proof enough to connect such acts
with the crime charged, so as to render evidence
thereof admissible, in determining which it was only
necessary that there should be so much proof as to
make it proper to submit the whole evidence to the
jury, and not that he should be satisfied beyond a
reasonable doubt. See, also, *Zoldoske* v. *State*, 82
Wis. 580 (52 N. W. 778).

Respondent's counsel call attention to the case of
*People* v. *Molineux*, 168 N. Y. 264 (61 N. E. 286, 62
L. R. A. 193). The majority opinion in that case
holds that evidence of the killing of a third person
was not admissible upon a trial for murder which
was induced by hatred engendered by quarrels, of
which the third person had no knowledge, where the
motive for the other killing was jealousy caused by
intervention in a love affair; and that proof of intent
cannot be aided by evidence of another murder com-
mitted by similar means, but for a different cause.
We think that this opinion is based upon narrow
grounds, and that the reasoning of Chief Justice
Parker in his dissenting opinion, where he cites a
large number of authorities in support of his opinion,
is the more satisfactory. The real test should be:
Do the facts constituting the other crime actually

tend to establish one or several elements of the crime charged? If so, they may be proved. Measured by this test, we are of opinion that evidence of Albert's death was admissible, and the court did not err in receiving it.

4. The thirty-eighth and thirty-ninth assignments of error complain of the action of the trial court in the matter of the surrender of Mrs. Sparling by her bondsmen and the taking of new bail in her case, in the presence of the jury. While this was a practice not to be commended, yet, owing to the part taken by one of the respondent's counsel, in the matter, and it not appearing that the prosecution had anything to do in bringing on the transaction, we do not think that the case should be reversed for that reason. It is mere conjecture to say that respondent was prejudiced by the occurrence. In *State* v. *Hyde, supra,* the circumstances were so different that the cases are readily distinguishable, and the occurrence there was not held to be reversible error, but improper.

5. The seventh, eighteenth, and twentieth assignments of error are to the effect that the court erred in permitting the three doctors, Conboy, Vaughn, and Warthin, to testify that in their opinion the cause of death was arsenical poisoning. It should be borne in mind that in the instant case there was really no dispute as to the cause of the death of either of the boys. The respondent testified that the symptoms of Scyrel were those of arsenical poisoning, and he entered into detail as to his suspicions of poison. He testified that the pathological examination of a portion of Scyrel's liver, made by his brother in London, revealed poison. This form of question, substantially, was asked in the following cases: *People* v. *Sessions,* 58 Mich. 594 (26 N. W. 291) ; *People* v. *Hare,* 57 Mich. 505 (24 N. W. 843) ; *People* v. *Vanderhoof,* 71 Mich. 158 (39 N. W. 28) ; *Mitchell* v. *State,* 58 Ala. 417; *Zoldoske* v. *State,*

*supra;* State v. *Hyde, supra.* In the last-cited case the court said:

"There are many cases where the expert may give an opinion upon the very point in issue, as, for instance, where insanity is the only issue before the jury; also where there can be but one conclusion from conceded facts, as death from wounds. But where the cause of the existing conditions is in dispute, and where the jury must determine which of the causes claimed by the respective parties is the right one, an expert should only be allowed to state that, in his opinion, a certain cause might produce the condition —not that it did produce it."

In the *Hyde Case* the question whether the *corpus delicti* was established was hotly contested. The theory of the State was that Col. Swope died from poison administered by the defendant. The theory of the defense was that he died from uræmic poison, or from old age. Each theory was strongly supported by the opinions of experts employed by the respective parties; and the hypothetical questions were there held improper, in that they called for a conclusion on facts to be determined by the jury. The facts in that case are readily distinguishable from those in the instant case, where all of the evidence of the cause of death pointed in one direction, that of poison by arsenic. This subject is considered in *Wood* v. *Railway Co.,* 181 Mo. 433 (81 S. W. 152), and the form of question here asked was sustained, and the court said:

"Neither do we appreciate the fine distinction sometimes sought to be drawn between asking the expert whether, in his opinion, certain causes might produce certain results, and asking him whether, in his opinion, they did produce certain results. It is well settled that the opinions of medical experts as to the cause of death are admissible, such opinions being founded either upon the personal knowledge of the facts of the case, or upon a statement of the nature of the injury or symptoms and nature of the disease

as testified to by others.   Rogers, Expert Testimony, § 49, and cases cited."

Having reference to the distinction which we have pointed out, we are of opinon that the court did not err in receiving the testimony.

6. Thirteen of the assignments of error relate to the rulings of the court permitting evidence to be received as to statements of Mrs. Sparling relating to the respondent, and her feelings toward him.   They were admitted as tending to show a conspiracy, and were claimed by the prosecution to be material as tending to show that the will of Mrs. Sparling was under the control of respondent.   This subject was treated by us in *People v. Auerbach,* 176 Mich. 23 (141 N. W. 869), and language of Justice COOLEY in *People v. Saunders,* 25 Mich. 119, was quoted.   It was there said:

"But it often happens that the existence of the conspiracy is only made out by inference from the acts and declarations of the several parties thereto; and to exclude evidence of these, until the conspiracy is established in some other way, would, in many cases, give the guilty parties immunity.   There is no class of cases in which it is more important that the circuit judge should have a large discretion as to the order in which evidence should be received; and this discretion cannot be reviewed on error except in clear cases of abuse.   *   *   *

"In this case it was sought to connect the several parties charged by evidence of their separate acts and statements.   This was, of course, competent."

We are of opinion that the court did not err in receiving this evidence.   The weight of it was for the jury, and in the charge the jury were instructed to consider the evidence of this nature, as bearing upon the general questions of intimate business and friendly relations, and claimed conspiracy and collusion.

7. There are many assignments of error relating to

the argument of the prosecuting attorney to the jury. Most of them relate to what are claimed to be expressions of opinion by the prosecuting attorney. When objection was made the prosecuting attorney said:

"Well, I ask the jury to cut out any belief I may have. I am in the habit of using that word. It is just what the testimony shows, gentlemen of the jury."

Certainly the course pursued by the prosecutor was improper and not to be commended; but, in view of the charge that "claims or statements of counsel on either side are not in evidence," and that the verdict should be based upon the evidence produced in open court, we cannot say that there was here reversible error.

We cannot extend this opinion to the length which would be required, to specifically discuss all of the assignments of error. All have, however, been considered by us. The assignments relating to respondent's requests to charge are not well taken, as the general charge was sufficiently full to cover them.

The assignments of error to the charge are too general to merit consideration. The 112th assignment is a fair sample of the others:

"The circuit judge erred in charging the jury as stated in the seventh paragraph of the judge's charge."

Many of the paragraphs cover more than half a page of the printed record, and contain many statements by the court in which the law is correctly stated. *Tupper* v. *Kilduff*, 26 Mich. 394; *Wanner* v. *Mears*, 102 Mich. 554 (61 N. W. 2). We have, however, examined the entire charge, and find that it was a very full and explicit statement of the law governing the case.

We find no reversible error in the record, and the judgment of the circuit court is affirmed.

MCALVAY, C. J., and BROOKE, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.